433 F.2d 74
 Joe GOOCH and Rafael Bustamante, et al., Plaintiffs-Appellants,
v.
Ramsey CLARK et al., Defendants-Respondents.
George MEANY et al., Plaintiffs in Intervention-Appellants,
v.
Ramsey CLARK et al., Defendants-Respondents.
 No. 24788.
 No. 24791.
 United States Court of Appeals, Ninth Circuit.
 September 8, 1970.
 Rehearing Denied December 1, 1970.
 
 Sheldon L. Greene (argued), San Francisco, Cal., for Gooch and others.
 Donald C. Carroll (argued) and Charles P. Scully, San Francisco, Cal., Woll & Mayer, Washington, D. C., for Meany and others.
 Cecil F. Poole, U. S. Atty. and David R. Urdan, Asst. U. S. Atty., Ralph Farb (argued), Stephen Suffin, I. & N. S., San Francisco, Cal., Will Wilson, Asst. Atty. Gen., Charles Gordon, Gen. Counsel, I. & N. S., Washington, D.C., for appellees.
 Before HAMLEY, HUFSTEDLER, and WRIGHT, Circuit Judges.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 The central issue on appeal is this: Does the 1952 Immigration and Nationality Act, as amended in 1965, close our international borders to "alien commuters", numbering some 30,000 to 40,000 persons? An alien or "green card" commuter is an alien who has been admitted into the United States for permanent residence, but who chooses to keep a home in Canada or Mexico and to cross daily or seasonally into this country to work. These commuters carry an alien registration receipt card (form I-151), commonly called a "green card" and use it as a border-crossing card in compliance with the documentation requirements of the Attorney General of the United States.
 
 
 2
 Suit was initiated on behalf of resident farm workers employed in southern California seeking an order directing Government officials to deny admission to alien commuters. The AFL-CIO intervened as a plaintiff, representing a broader class of residents of the United States with whom the alien commuters compete in the labor markets adjoining our international boundaries. The Government[1] successfully moved for a summary judgment from which this appeal was taken.
 
 
 3
 The district court had jurisdiction under 28 U.S.C. § 1361. Our jurisdiction rests on 28 U.S.C. § 1291. Both sets of plaintiffs base their standing upon the alleged adverse impact of alien commuters on the wage levels and working conditions of United States residents in those areas.[2] The district court held that the plaintiffs had standing, and the Government no longer challenges this holding, relying on the authority of Association of Data Processing Serv. Organizations v. Camp (1970) 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 and Barlow v. Collins (1970) 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192.[3]
 
 
 4
 The Government contends that an alien commuter is within the class of persons described by 8 U.S.C. § 1101(a) (27) (B): "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." Such a classification would entitle the Attorney General to admit commuters under the informal documentation requirements authorized by 8 U. S.C. § 1181(b) and would exempt commuters from the labor certification provisions of 8 U.S.C. § 1182(a) (14). Appellants argue that commuters are not entitled to this classification because they are (1) "nonimmigrants" rather than "immigrants," (2) not "lawfully admitted for permanent residence", and (3) not "returning from a temporary visit abroad." We discuss the issues seriatim.
 
 I.
 
 5
 The Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 et seq. ("the Act"), provides a comprehensive scheme for the admission and exclusion of aliens. It allows for the admission of aliens[4] under either "immigrant" or "nonimmigrant" status. Section 1101(a) (15) supplies a negative definition of "immigrant":
 
 
 6
 "The term `immigrant' means every alien except an alien who is within one of the following classes of non-immigrant aliens — [12 classes of non-immigrants follow]."
 
 
 7
 In construing the 1952 Act, "we are not concerned with the ordinary definition of the word `immigrant' as one who comes for permanent residence. The Act makes its own definition * * *. The term thus includes every alien coming to this country either to reside permanently or for temporary purposes, unless he can bring himself within one of the exceptions." Karnuth v. United States ex rel. Albro (1929) 279 U.S. 231, 242-243, 49 S.Ct. 274, 278, 73 L.Ed. 677.[5]
 
 
 8
 Appellants argue that commuters are within an exception and are therefore nonimmigrants, citing 8 U.S.C. § 1101(a) (15) (H) (ii). That section defines one kind of nonimmigrant as:
 
 
 9
 "(H) an alien having a residence in a foreign country which he has no intention of abandoning (i) * * * or (ii) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country * * *."
 
 
 10
 A review of the administrative practice regarding commuters and the legislative history of the subsection convince us that Congress did not intend commuters to fall within (H) (ii); indeed, they are disqualified by the very language of the subsection.
 
 
 11
 Prior to the enactment of the 1952 Act, the administrative construction was uniform: Commuters were not nonimmigrants.[6] That practice was well known to Congress when it was drafting the 1952 Act.[7] There is no indication that subsection (H) (ii) was added to the 1952 Act for the purpose of changing the Service's handling of commuters. On the contrary, the legislative history demonstrates that the subsection was addressed to a wholly different matter: During and immediately following World War II, Congress passed a series of measures authorizing the temporary admission of agricultural workers in order to alleviate domestic labor shortages.[8] After reviewing these measures, a 1950 Senate study group recommended "that provision should be made in permanent legislation which would permit the admission of temporary agricultural labor in a nonimmigrant classification when like labor cannot be found in this country."[9] Subsection (H) of the 1952 Act was an expanded implementation of this recommendation.[10] Its purpose was not to affect commuters; it was designed to permit admission of a new group of aliens under restrictive circumstances.[11]
 
 
 12
 To construe subsection (H) as appellants urge would render inexplicable the further requirement in (H) (ii) that "unemployed persons capable of performing such service or labor cannot be found in this country." This phrase is part of the definition of aliens falling within the (H) (ii) class of nonimmigrants. Unemployed persons can be found to perform the work now done by commuters; appellants have based their standing on that fact. Thus, the same section would classify commuters as nonimmigrants and simultaneously declassify them — a nonsense reading of the section. Subsection (H) (ii), read in the context of (H) (i) and (H) (iii), was intended to confer nonimmigrant status on certain aliens who were needed in the American labor force but who, unlike commuters, would be unable to achieve admittance under immigrant status.[12]
 
 
 13
 We conclude that commuters are not nonimmigrants under section 1101(a) (15) (H) (ii). (In the Matter of H______ O______ (Bd.Imm.App. 1954) 5 I. & N.Dec. 716; see also C. Gordon & H. Rosenfield, Immigration Law and Procedure (rev.ed.1969) 2-71 to 2-75, 6-57 to 6-58.)[13] Nor are commuters visiting the United States "temporarily for business" under nonimmigrant category (B) of section 1101(a) (15). (See Karnuth v. United States ex rel. Albro, supra)[14]. None of the other nonimmigrant categories being applicable, we conclude that commuters are "immigrants."
 
 II.
 
 14
 Are commuters "lawfully admitted for permanent residence"? The phrase is itself a term of art,[15] defined in the Act as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." (8 U.S.C. § 1101(a) (20). We agree with the Government that the definition refers not to the actuality of one's residence but to one's status under the immigration laws.[16] Commuters have been accorded the privilege of residing permanently in the United States, for each of them at one time received a valid immigration visa. Their disinclination to exercise that privilege is of no moment.
 
 
 15
 Appellants argue that most commuters would no longer qualify for immigration visas if they applied anew, and thus their status under the immigration laws has changed, disqualifying them under the phrase from section 1101(a) (20), "such status not having changed." That quoted phrase refers primarily to aliens who have changed their status from immigrants to nonimmigrants. (Matter of M______ P______ (Bd.Imm.App.1962) 9 I. & N. Dec. 747; In the Matter of S______ (Bd.Imm.App. 1954) 6 I. & N. Dec. 392, approved (Attorney General 1955) 6 I & N. Dec. 397.) It has little meaning in the context of section 1101(a) (27) (B), referring to immigrants lawfully admitted for permanent residence. But section 1101(a) (20) is definitional, having application to a great many parts of the Act, and we should not be disturbed that the phrase "such status not having changed" appears meaningless in one particular usage. Other sections of the Act refers to aliens lawfully admitted for permanent residence (e.g., U.S.C. § 1182(c)), and in that context the phrase is meaningful. We think the Government is right that commuters are "lawfully admitted for permanent residence."
 
 III.
 
 16
 The final requirement of section 1101(a) (27) (B), necessary to allow using informal documentation under section 1181(a),[17] is that the immigrant be "returning from a temporary visit abroad." The Government argues that a commuter's nightly or seasonal departure from the United States to his foreign residence is a "temporary visit" from which he "returns" when he reenters the United States for employment.
 
 
 17
 Section 1181(b) was amended in 1965. The 1952 version did not refer to section 1101(a) (27) (B), but supplies its own definition of those persons exempted from formal documentation requirements: "otherwise admissible aliens lawfully admitted for permanent residence who depart from the United States temporarily."[18] The 1965 amendment thus had the effect of replacing the phrase "depart[ing] from the United States temporarily" with "returning from a temporary visit abroad", the language used in section 1101(a) (27) (B). Appellants argue that Congress intended by this amendment to terminate admission of commuters, because one cannot say that an alien is "returning from a temporary visit abroad" when he is, in fact, leaving home to go to work.[19]
 
 
 18
 The Government's construction of the 1965 amendment strains the language severely. But that strain is not as intolerable as is appellants' reading of the amendment. Appellants ask us to conclude from a minor and obscure change in the language of section 1181(b) that Congress intended to end a well-known practice of the Service of more than 38 years, thereby grossly affecting some 40,000 commuters, their families, and their employers.
 
 
 19
 The legislative history is virtually silent — an eloquent silence, in view of the national and international implications that all parties agree would follow from a termination of commuting. That silence is broken only by an obscure colloquy that took place two years before section 1181(b) was amended, during a hearing before the House Judiciary Subcommittee. The exchange was between General Counsel for the Service and a legislative assistant to the Committee who agreed that the departure from the United States temporarily was a better description of a commuter's travels than "returning from a temporary visit abroad."[20] The hearings resulted in no Committee recommendation against the commuter program and there is no hint that anyone outside the hearing room knew of the exchange until appellants' counsel unearthed it. Commuters are mentioned nowhere else in the massive legislative history of the 1965 changes.[21]
 
 
 20
 For many years before 1965, the Immigration Service had taken the position that commuters were "returning from a temporary visit abroad" as used in section 1101(a) (27) (B).[22] The drafters of the 1965 amendment might well have had this in mind. The commuter practice has lasted for 43 years with Congress' knowledge and acquiescence. Congress is still aware of the commuter practice, and the problems it entails: There are several pending bills before Congress directed particularly toward commuters. (See Note, supra, 21 Stan.L.Rev. at 1768-74.) Under these circumstances, we do not accept appellants' contention that Congress intended to close our borders to commuters when it enacted a technical revision of section 1181(b).
 
 IV.
 
 21
 Prior to the 1965 amendments to the Act, 8 U.S.C. § 1182(a) (14) required the exclusion of aliens "seeking to enter the United States for the purpose of performing skilled or unskilled labor" if the Secretary of Labor certified that United States residents were available to undertake such labor and that the employment of aliens would adversely affect the wages and working conditions of those United States residents.[23] The 1965 amendments tightened section 1182(a) (14) by requiring exclusion unless the Secretary of Labor certified that admission would not have these adverse consequences.[24] But both the old and new versions of the section apply only to certain enumerated classes of aliens, and aliens falling within section 1101(a) (27) (B) are not among them. At the time of a commuter's initial entrance into the United States, he would have to comply with section 1182(a) (14). But once such a lawful admittance occurred, the commuter could thereafter make regular entrances into the United States as an immigrant "lawfully admitted for permanent residence, who is returning from a temporary visit abroad."[25]
 
 
 22
 It was in this connection that the Immigration Service, even prior to the 1965 amendments to section 1181(b), argued that commuters were "returning from a temporary visit abroad" and thus fell within section 1101(a) (27) (B). In Amalgamated Meat Cutters & Butcher Workmen of North America v. Rogers (D.D.C.1960) 186 F.Supp. 114, the Secretary of Labor had certified that the admission of aliens to work in a particular plant in El Paso, Texas, would create the adverse conditions described in section 1182(a) (14). The Service nevertheless declined to exclude commuters bound for the plant, considering them unaffected by the certification. The union then brought suit to require the commuter's exclusion. While the district court agreed with the Service that the order was not applicable against section 1101(a) (27) (B) immigrants, it held that commuters were not within this class. The case quickly became moot, and no appeal was taken. Nevertheless, the Service disagreed with the result reached, declined to follow it, and made clear to Congress its opposition to the decision.[26] The opinion has also been criticized elsewhere. (Note, supra, 21 Stan.L.Rev. at 1755-57.) We agree that Amalgamated Meat Cutters was wrongly decided, and can find no evidence that Congress intended to adopt the decision in its 1965 amendments to the Act. Section 1182(a) (14) cannot now be read, therefore, to bar the admission of commuters.
 
 
 23
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 For convenience we use "Government" to refer to the individually named Government officials. Occasionally "Immigration Service" or "Service" is used to refer to the Immigration and Naturalization Service
 
 
 [2]
 See Note, "Aliens in the Fields: The `Green-Card Commuter' Under the Immigration and Naturalization Laws" (1969) 21 Stan.L.Rev. 1750, 1763-68, for a discussion of studies of the commuter impact.
 
 
 [3]
 An earlier attack on the commuter practice was dismissed for lack of standing. Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 330 F.2d 217, cert. denied (1964) 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36
 
 
 [4]
 An "alien" is every person not a citizen or national of the United States. 8 U.S.C. § 1101(a) (3)
 
 
 [5]
 The Supreme Court was construing the predecessor of § 1101(a) (15) — Immigration Act of 1924, Pub.L. No. 139, ch. 190, § 3, 43 Stat. 153, 154, formerly 8 U.S.C. § 203 — which provided:
 "When used in this Act the term `immigrant' means any alien departing from any place outside the United States destined for the United States, except [the enumerated classes of nonimmigrants]."
 
 
 [6]
 This Immigration Service practice was established in 1927See generally In the Matter of L______ (Central Office 1951) 4 I. & N. Dec. 454; Note, supra, 21 Stan.L.Rev. at 1751-55; 8 C.F.R. § 110.6 (1947 supp.).
 
 
 [7]
 "[Nonresident alien border-crossing cards] will not be issued to aliens who * * * have been admitted into the United States for permanent residence. Aliens in the last category who cross the borders frequently are known as commuters and are not nonimmigrants * *." Senate Comm. on the Judiciary, The Immigration and Naturalization Systems of the United States, S.Rep. No. 1515, 81st Cong., 2d Sess. (1950) 616;see also id. at 535-537.
 
 
 [8]
 See Act of Feb. 14, 1944, Pub.L. No. 229, ch. 16, 58 Stat. 11, 15-16, extended several times until 1948. See also Act of July 12, 1951, Pub.L. No. 78, ch. 223, 65 Stat. 119, extended several times through December 31, 1964.
 
 
 [9]
 S.Rep.No. 1515,supra note 7, at 586.
 
 
 [10]
 "These provisions of the bill grant the Attorney General sufficient authority to admit temporarily certain alien workers, industrial, agricultural, or otherwise, for the purpose of alleviating labor shortages as they exist or may develop in certain areas or certain branches of American productive enterprises, particularly in periods of intensfied production." H.R. Rep.No. 1365, 82d Cong., 2d Sess., 1952 U.S.Code Cong. & Ad.News, pp. 1653, 1698
 
 
 [11]
 See 8 U.S.C. § 1184(c); 8 C.F.R. § 214.2(h) (2) (ii); 20 C.F.R. § 602.10.
 
 
 [12]
 Cf. Hess v. Esperdy (S.D.N.Y.1964) 234 F.Supp. 909, 912. Commuters are in the unusual position of preferring immigrant to nonimmigrant status. Most aliens classified in the residual category of immigrants cannot achieve admittance to the United States because of severe numerical limitations for that category; they therefore seek admittance as nonimmigrants, for which there are no numerical limitations. By adding the (H) (ii) category of nonimmigrants, Congress thus made possible the admittance of a new group of aliens. Every alien is presumed to be an immigrant until he satisfactorily shows that he is a nonimmigrant. 8 U.S.C. § 1184(b). But because commuters are not subject to the standard numerical limitations for immigrants (see 8 U.S.C. § 1101 (a) (27) (B), immigrant status is preferred; they need not meet the "qualitative" requirements of the various nonimmigrant categories.
 
 
 [13]
 Congress recently amended parts (i) and (iii) of § 1101 (a) (15) (H). Act of Apr. 7, 1970, Pub.L.No. 91-225, 84 Stat. 116. The legislative history of the amendment makes no reference to commuters
 
 
 [14]
 We hesitate only momentarily in citingKarnuth for this proposition. Karnuth was brought by European nationals who were residing in Canada and seeking to commute to the United States. Being subject to the immigrant quotas for their home countries, they attempted to acquire nonimmigrant status under § 3(2) of the 1924 Act, the predecessor to 8 U.S.C. § 1101(a) (15) (B). The Supreme Court upheld the Service's ruling that these commuters were immigrants and therefore subject to the quotas. In so holding, the Court relied heavily on congressional intent to restrict immigration and to protect American labor.
 Most aliens who acquired commuter status after Karnuth were Mexican and Canadian nationals and thus not subject to immigration quotas. § 4(c) of the 1924 Act; 8 U.S.C. § 1101 (a) (27) (A). But the 1965 amendments to the Immigration and Nationality Act have now restricted the numbers of Western Hemisphere aliens who can achieve initial admittance under immigrant status. See Act of Oct. 3, 1965, Pub.L.No. 89-236, § 21(e), 79 Stat. 921, and discussion infra of 8 U.S.C. § 1182(a) (14). Under these circumstances, we read Karnuth as an authoritative interpretation of § 1101(a) (15) (B).
 
 
 [15]
 "Section [1101(a) (20)] defines precisely the term `lawfully admitted for permanent residence.' This term has especial significance because of its application to numerous provisions of the bill." H.R. Rep.No. 1365,supra note 10, at 1684.
 
 
 [16]
 Even before the 1952 Act, the Immigration Service took the position that whether a commuter was "lawfully admitted" to the United States was a question of status. Matter of F______ (Bd.Imm. App. Dec. 30, 1946) A-6300563,cited in Editor's Note, 3 I. & N. Dec. 526. Adoption of 8 U.S.C. § 1101(a) (20) can thus be seen as an approval of the Service's position. See In the Matter of H______ O______ (Bd.Imm.App.1954) 5 I. & N. Dec. 716. Congress was also aware in 1952 that the Service considered commuters "admitted into the United States for permanent residence." See note 7 supra.
 
 
 [17]
 Actually, § 1181(b) provides for waiver for such immigrants "in such cases or in such classes of cases and under such conditions as may be by regulations prescribed * * *."Cf. Tejeda v. Immigration & Naturalization Service (9th Cir. 1965) 346 F.2d 389, 391 n. 1. But there has been no published regulation dealing with commuters since 1952. 8 C.F.R. § 211.1(b) (1), dealing with the use of form I-151, does not include commuters within its scope except for, the Government argues, the last sentence thereof.
 The nonexistence of a regulation is not fatal to the Government's case. The practice of admitting commuters is long standing, was the topic of numerous regulations in the past (e. g., 8 C.F.R. § 166.1 (1944 Supp.)), and has been continuously recognized in administrative decisions. We are not dealing with an ad hoc admission practice, unknown to Congress or uncontrolled by the Service. The Board of Immigration Appeals has established, by administrative case law, clear rules as to who is entitled to commuter status and how that status can be lost. E. g., Matter of M______ D______ S______ & L______ G______ & W______ D______ C______ (Bd.Imm.App.1958) 8 I. & N. Dec. 209. At least in this context, we read the regulation requirement of § 1181 (b) to be permissive.
 
 
 [18]
 Immigration and Nationality Act, Pub. L. No. 414, ch. 477, § 211(b), 66 Stat. 181. The language resembled that of its predecessor section in the 1924 Act, § 13(b), formerly 8 U.S.C. § 213(b): "immigrants who have been legally admitted to the United States and who depart therefrom temporarily." The 1965 amendment was Act of Oct. 3, 1965, Pub. L. No. 89-236, § 9, 79 Stat. 917
 
 
 [19]
 But even theold § 1181(b) has been viewed as asking whether an immigrant was returning from a "temporary visit abroad." Barrese v. Ryan (D.Conn.1962) 203 F.Supp. 880, 888.
 
 
 [20]
 House Comm. on the Judiciary, Subcomm. No. 1, Study of Population and Immigration Problems, Administrative Presentations (III), Admission of Aliens Into the United States for Temporary Employment and "Commuter Workers" (Comm.Print 1963) 161-169 (Hearings of June 24, 1963)
 
 
 [21]
 The statement in the Senate report relied upon by appellants refers to the revision of § 1181(a), rather than 1181(b). S.Rep.No. 748, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Ad.News, pp. 3328, 3342. The House report states, without explanation, that § 1181 is amended "tobroaden the authority of the Attorney General to waive documentation required of a returning resident alien." H.R.Rep. No. 745, 89th Cong., 1st Sess. (1965) 21 (emphasis added).
 
 
 [22]
 See discussion infra of Amalgamated Meat Cutters & Butcher Workmen of North America v. Rogers (D.D.C.1960) 186 F.Supp. 114. And the Service thought commuters admissible under regulations to the 1924 Act as § 4(b) nonquota immigrants: "an immigrant previously lawfully admitted to the United States, who is returning from a temporary visit abroad." See In the Matter of D______ C______ (Central Office & Bd. Imm.App.1949) 3 I. & N.Dec. 519; Note, supra, 21 Stan.L.Rev. at 1754. As such, they were admissible with alternative documentation: a border-crossing identification card. See 8 C.F.R. §§ 110.37, 110.56 (1941 Supp.). These cards were not recognized by Congress until 1940. Alien Registration Act of 1940, Pub.L.No. 670, ch. 439, § 30, 54 Stat. 670, 673.
 
 
 [23]
 Immigration and Nationality Act, Pub. L.No. 414, ch. 477, § 212(a) (14), 66 Stat. 183
 
 
 [24]
 Act of Oct. 3, 1965, Pub.L.No. 89-236, § 10, 79 Stat. 917
 
 
 [25]
 According to the record of the case before us, no certifications beneficial to commuters have been issued since the 1965 amendments. Consequently, we are concerned exclusively with immigrants who attained lawful admittance prior to 1965
 
 
 [26]
 Staff of House Comm. on the Judiciary, Immigration and Nationality Act With Amendments and Notes on Related Laws (Comm.Print 4th ed. 1964) 210; House Comm. on the Judiciary, Subcomm. No. 1, Study of Population and Immigration Problems, Judicial Decisions Construing Certain Provisions of the Immigration and Nationality Act (Comm.Print 1963) 14; see House Comm. on the Judiciary,supra note 20, at 163-64. No final order was issued in the case because of mootness. In Matter of J______ P______ (1962) 9 I. & N.Dec. 591, the Board of Immigration Appeals gave limited enforcement to the decision.
 Amalgamated was decided, not on the ground that commuters were not "returning from a temporary visit abroad," but on the ground that they were not lawfully admitted for permanent residence. Our disagreement with this conclusion is explained supra.
 
 
 
 24
 EUGENE A. WRIGHT, Circuit Judge (dissenting);
 
 
 25
 The Immigration and Nationality Act requires generally that all immigrants entering the United States possess a valid, unexpired visa. 8 U.S.C. § 1181(a). To this rule only one exception is made. § 1181(b). It allows "returning resident immigrants, defined in section 1101(a) (27) (B)" to be readmitted to the United States without a visa. Within § 1101(a) (27) (B) fall immigrants "lawfully admitted for permanent residence who [are] returning from a temporary visit abroad."
 
 
 26
 These provisions, as the Service concedes, were designed primarily to assist aliens actually resident in the United States, who are eligible for citizenship, are treated for most purposes like citizens, and whose re-entry Congress had every reason to facilitate. The question in this case is the very narrow one whether the benefits Congress indubitably granted to aliens actually resident here extend also to commuters, who by definition neither reside here nor intend to do so, and who are ineligible to citizenship. Petition of Correa, 70 F.Supp. 265 (W.D.Tex.1948).
 
 
 27
 Is the commuter "lawfully admitted for permanent residence" within the meaning of § 1101(a) (27) (B)? If he is, then when he returns to the United States from a visit home,[1] the Service may admit him pursuant to § 1181(b) without a valid visa[2]. But if he is not, then the Government concedes that there is no authority in the immigration statutes for such informal admission, and the petitioners are entitled to an order compelling the Service to obey the law.
 
 
 28
 The crux of the majority's opinion in this case is thus the first paragraph of Part II, where the majority, without discussion and virtually without authority, accepts the Service's contention that an alien is "lawfully admitted for permanent residence" merely by virtue of the fact that he has at some time in the past been issued an immigrant visa. Immaterial are both an actual residence in the United States and the intention to establish one. Since I think this conclusion at war with the most elementary principles of statutory construction and unsupported by any consistent administrative interpretation, I must respectfully dissent.[3]
 
 I.
 
 29
 As the majority points out, "lawfully admitted for permanent residence" is a term of art, one that appears in many sections of the Act besides § 1101(a) (27) (B). The authors of the Act took the trouble carefully to define the term, § 1101(a) (20), and stated that a precise definition was necessary since "this term has especial significance because of its application to numerous provisions of the bill." H.R.Rep.No.1365, 82d Cong., 2d Sess., 1952 U.S.Cong. & Adm.News, pp. 1653, 1684. Congress could not have made clearer its intention that the term be given a uniform significance throughout the Act. We are thus not at liberty to adopt one meaning of "lawfully admitted for permanent residence" in § 1101(a) (27) (B) and another in the other sections where the phrase appears: if commuters are lawfully admitted for permanent residence for purposes of § 1101(a) (27) (B), then they must be lawfully admitted for permanent residence for purposes of all other sections of the Act.
 
 
 30
 But, as I hope to show below, the majority's construction of "lawfully admitted for permanent residence" as including commuters makes nonsense of the congressional policy embodied in no fewer than five sections of the Act entirely apart from § 1101(a) (27) (B), and is contrary to the plain meaning of two others. I conclude, simply on the basis of the language of the Act, that Congress cannot have thought commuters were "lawfully admitted for permanent residence." Take first § 1182(h) and § 1182(i). These sections provide for waiver by the Attorney General, under certain circumstances, of the ban against entry of aliens who have been convicted of a crime or who have procured entry documents by fraud. In both cases the Attorney General may grant waiver only if the alien is the spouse, child, or parent of "a United States citizen or of an alien lawfully admitted for permanent residence." If an alien lawfully admitted for permanent residence is taken to be one who actually resides or actually intends to reside in the United States, then the sections embody a humanitarian, family-maintaining policy for residents of the United States. But I can think of no reason why Congress would choose to extend favored treatment, for example, to a Mexican convicted of a crime, simply because he was the parent of a commuter resident in Tijuana.
 
 
 31
 Or take § 1182(a) (14). Read together with § 1101(a) (27) (A), the effect is to provide that a Mexican laborer seeking to enter the United States as a special immigrant (not as a commuter) must receive Labor Department certification unless he is the parent, child, or spouse of a United States citizen or of an alien lawfully admitted for permanent residence. Once again, this is a sensible and humanitarian policy if the laborer's relatives actually reside in the United States. But why would Congress want to allow a Mexican laborer into the country as a special immigrant without certification, simply because his son is a commuter — by definition a resident of Mexico?
 
 
 32
 There are similar examples in other contexts. Thus § 1153(a) (2) awards second preference visas to the spouse, unmarried son or unmarried daughter of an alien lawfully admitted for permanent residence. No doubt few visas would be awarded to commuter families under this provision, since immigrants born in the Western Hemisphere are exempt from the numerical limitations on entry. § 1153(a). But it remains hard to see why Congress would want to give special preference to the children born abroad of parents who emigrate to Canada or Mexico and become commuters.
 
 
 33
 Finally, § 1251(f) forbids the deportation of an alien who procured entry by fraud, if he is the spouse, parent, or child of a citizen or of an alien lawfully admitted for permanent residence. Would this court really construe § 1251(f) as forbidding the deportation of a Mexican who had procured entry by fraud, simply because he had a son who was a commuter resident in Tijuana? I cannot believe we would, but if the majority opinion is correct we would be obliged to.
 
 
 34
 So far I have discussed only the untoward consequences for other sections of the Act that flow from the majority's actual holding in this case — that commuters are lawfully admitted for permanent residence. The reasoning of the majority, however, leads to consequences still more absurd than the actual holding.
 
 
 35
 The majority argues that commuters are lawfully admitted for permanent residence simply because "each of them at one time received a valid immigration visa." If this is correct, it follows that all of the thousands of people, all over the world, who have ever received a valid immigration visa, also qualify as aliens lawfully admitted for permanent residence. Such aliens would not of course be commuters, since never having come to this country they could not be said to be "returning from a temporary visit abroad" and would be ineligible to use Form I-151 as an entry document. But since according to the majority they were lawfully admitted for permanent residence, they are entitled to the benefits which that status confers.
 
 
 36
 Thus their relatives who have been convicted of crimes are entitled to specially favorable treatment. § 1182(h). Their relatives who enter this country by fraudulent means may not be deported. § 1251(f). If they were born in the Western Hemisphere, their relatives may enter as special immigrants without certification by the Secretary of Labor. § 1182(a) (14). Most startling of all, the unmarried sons and daughters of such aliens are entitled to second preference visas even though the alien himself might have been eligible for no preference whatsoever. And all these consequences follow even if the alien "lawfully admitted" never leaves his homeland. If Congress intended such a result, it chose an odd way of saying so.
 
 
 37
 Two other sections of the Act also suggest strongly that the majority is incorrect in making "lawfully admitted for permanent residence" turn solely on the fact that an immigration visa was issued, without regard to the residence or intended residence of the alien. The first is § 1182(g). That section grants privileges to the parent or unmarried son or daughter of "a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa." If the majority position is correct, then the entire last phrase is surplusage, since any alien who has been issued an immigrant visa is an alien lawfully admitted for permanent residence. Congress, however, seems to have thought the categories distinct.
 
 
 38
 Second is the definition of the border-crossing card in § 1101(a) (6). The statute there distinguishes between an "alien lawfully admitted for permanent residence" and an "alien resident in foreign contiguous territory." If one accepts the Service's construction of "lawfully admitted for permanent residence," I suppose that it is possible to give some meaning to the second phrase by construing it as applicable to non-immigrants. But the question before us is precisely whether the Government's construction of the statute is correct. And, approaching § 1101(a) (6) with an open mind, it would certainly appear that the plain meaning of the words indicates that an "alien lawfully admitted for permanent residence" is not an "alien resident in foreign contiguous territory."
 
 II.
 
 39
 Any lingering doubt that commuters are not lawfully admitted for permanent residence ought to have been dispelled by Congress's failure to modify § 1101(a) (27) (B) in 1965. Judge Youngdahl had held five years previously, in the only decision on point, that commuters could not be considered lawfully admitted for permanent residence within the meaning of the section. Amalgamated Meat Cutters & Butcher Workmen of North America v. Rogers, 186 F.Supp. 114 (D.D.C.1960). Congress was well aware of the decision, as the committee hearings show. But it expressed no dissatisfaction whatsoever with Judge Youngdahl's decision, and declined to amend the statutory provisions on which it was based. The majority makes much of the silence of Congress as evincing an intention not to change the law. But, whatever the case in regard to other matters, the law left unchanged as to § 1101(a) (27) (B) was Judge Youngdahl's decision. Under the circumstances, I think it must be deemed adopted.[4]
 
 
 40
 The conclusion derives support from the 1965 change in wording of § 1181(b). Until 1965, the section provided informal documentation requirements for aliens "lawfully admitted for permanent residence" returning to the United States from abroad. Congress changed the language to refer to "returning resident immigrants, as defined in § 1101(a) (27) (B)." Assuming that the majority is correct and that no change in the substantive law was intended, the new language indicates Congress's belief that those who were "lawfully admitted for permanent residence" could properly be described as "resident immigrants". Such a belief is perfectly compatible with Judge Youngdahl's view. But it is hard indeed to square with the Service's position that residence in the United States is irrelevant in determining whether an alien is lawfully admitted for permanent residence.
 
 III.
 
 41
 Nor can I agree with the majority that the definition of lawfully admitted for permanent residence contained in § 1101(a) (20) requires us to adopt the Service's construction here. As the Government's brief points out, the statutory definition comes ultimately from United States ex rel. Georgas v. Day, 43 F.2d 917, 918-919 (2d Cir. 1930), and United States ex rel. Stapf v. Corsi, 287 U.S. 129, 133, 53 S.Ct. 40, 77 L.Ed. 215 (1932), cases involving a very different problem.
 
 
 42
 In those cases an alien who had improperly gained admission to the United States stayed in this country for three years, until the statute of limitations had run and he could no longer be deported. He then went abroad, and upon his return to the United States the Service attempted to exclude him. He contended that since before leaving the United States he had been a legal resident (in the sense of being non-deportable), he was entitled to re-enter as an "immigrant previously lawfully admitted to the United States returning from a temporary visit abroad," as the statute then read.
 
 
 43
 The courts in both Georgas and Stapf rejected the alien's contentions. They drew a distinction between aliens who, for whatever reasons, were non-deportable and those who, by virtue of a lawful admission in the past, occupied the status of being lawfully admitted for permanent residence. Only the latter type of lawfully resident alien was entitled to re-enter the United States upon returning from abroad. The history § 1101(a) (20) thus shows that the language was adopted simply to reject for the future the contentions that Georgas and Stapf had made. And in neither of those cases was there the remotest suggestion that the courts endorsed the doctrine now espoused by the Service, or considered actual residence in the United States irrelevant to the status of having been lawfully admitted. Both Georgas and Stapf were unmistakably residents of the United States at the time they went abroad.
 
 
 44
 The majority also rely on evidence that Congress in 1952 knew that the Service considered commuters aliens lawfully admitted for permanent residence. But of course the question for us is whether Congress, knowing the Service's practice, adopted it — whether, in other words, the definition of "lawfully admitted for permanent residence" in the statute is the same as the one used by the Service before 1952. The best guide to what Congress intends, of course, is what it says, and for the reasons given in Part I, I cannot agree that the language of the Act is compatible with the Service's interpretation.
 
 
 45
 Finally, I doubt that in the circumstances of this case any firm conclusions can be drawn from Congress's failure to curtail the Service's commuter practice. Prior to the change in the Secretary of Labor's certification procedure in 1965, it mattered very little whether an alien was admitted as a special immigrant under § 1101(a) (27) (A) or as a commuter under § 1101(a) (27) (B). No quota or other restrictions faced either class of entering aliens. Only if the Secretary of Labor made a certification — a fairly rare event — did the commuter even arguably have any advantages over the special immigrant. Even this advantage, moreover, by 1965 would have seemed foreclosed by Judge Youngdahl's decision in Amalgamated Meat Cutters, supra, and the Service's decision in Matter of Bailey, supra note 3. Congressmen familiar with the law, and aware that many thousands of Mexicans entered the country to find work, can be forgiven their failure to protest immediately what must have seemed only a minor and technical violation of the rules — the admission as commuters of those who would have been admissible without difficulty as special immigrants.
 
 IV.
 
 46
 The Service argues finally that the mere existence of the commuter practice constitutes an administrative construction of the Immigration Act which we should honor. For the reasons already stated, it seems to me that the plain meaning of the Act and the intent of Congress are so clear as to foreclose judicial deference to an administrative agency. But I think it important to point out that we are not presented here with any consistent or coherent interpretation of the sort to which courts have traditionally deferred. Cf. Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933). Indeed, to the extent that the Service has in the past advanced any consistent interpretation of the Immigration Act, that interpretation has been directly in conflict with the Service's position in this case.
 
 
 47
 It is of course true that the Service has since 1952 continued to admit commuters to the United States without requiring entry visas. But the Service itself has admitted that the real basis of the practice is not statutory command but administrative fiat:
 
 
 48
 "The commuter situation manifestly does not fit into any precise category found in the immigration statutes. The status is an artificial one, predicted upon good international relations maintained and cherished between friendly neighbors."
 
 
 49
 Matter of M______ D______ S______ et al., 8 I. & N. Dec. 209, 213 (1958) (emphasis supplied).
 
 
 50
 Nor has the Service sought to legitimize this essentially lawless position by regulations describing and controlling the operations of the commuter system. Prior to 1952, of course, such regulations existed. But they were repealed upon passage of the Immigration Act and never again republished — eloquent testimony, in and of itself, to rebut the Service's current view that Congress in 1952 intended no change in the commuter practice.
 
 
 51
 Despite the absence of regulations, however, commuters continued to cross the border freely. The Service took the position that the 1952 Act had not disturbed "the practice of considering commuters as permanent residents", and relied on the "fiction of a commuter's permanent United States residence coinciding with his place of employment." Matter of H______ O______, 5 I. & N.Dec. 716, 718-19 & n. 13 (1954).
 
 
 52
 This position was formalized in a regulation issued in 1957 which, with changes not material here, remained in force until 1966. It read as follows:
 
 
 53
 "§ 211.1. Visas. A valid, unexpired immigrant visa shall be presented by each arriving immigrant alien except an immigrant who (a) was born subsequent to the issuance of an immigrant visa to his accompanying parent and applies for admission during the validity of such visa, or (b) is returning to an unrelinquished lawful permanent residence after a temporary absence abroad (1) not exceeding one year and present a Form I-151 alien registration receipt card duly issued to him, or (2) presents a valid unexpired re-entry permit duly issued to him, or (3) satisfies the district director in charge of the port of entry that there is good cause for the failure to present the required document, in which case an application for waiver shall be made on Form I-193."
 
 
 54
 22 Fed.Reg. 6377 (1957) (emphasis supplied).
 
 
 55
 The regulation is plainly inconsistent with the Service's present position. It clearly forbids the entry without a valid or re-entry permit of any immigrant not returning to an "unrelinquished lawful permanent residence" in the United States, and thus makes the privilege of using a Form I-151 to gain entry dependent upon actual residence in the United States. It is compatible with the commuter practice, which continued during the years 1957-66, only on the assumption, apparently made by the Service, that a commuter's place of employment constitutes an unrelinquished lawful permanent residence in the United States.
 
 
 56
 The same view of the Act was taken by the Service in the 1958 decision in Matter of M______ D______ S______, et al., supra. That was an appeal by the District Director from a finding by the Special Inquiry Officer that certain alien commuters had been improperly excluded. The aliens had been issued immigrant visas, had used them to acquire Forms I-151, and had until a little more than six months previously been employed in the United States and admitted as commuters. When they sought to gain entry into the United States, they presented their still valid Forms I-151. The District Directors, however, excluded them on the grounds that they could not claim commuter status if they had had no United States employment for six months previously.
 
 
 57
 The Special Inquiry Officer, adopting essentially the position now urged by the Service, ruled that since the aliens had been lawfully admitted for permanent residence, they were entitled to use the Form I-151 as long as the latter was valid — at that time as now one year. But the Board of Immigration Appeals reversed, holding that by being unemployed for six months the commuters had abandoned [their] status of permanent resident[s]." 8 I. & N.Dec. at 213. Once again, therefore, the Service expressed its understanding that actual residence in the United States was essential to the commuter's status as an alien lawfully admitted for permanent residence but that the commuter's place of employment was such a residence.
 
 
 58
 This view of the Act was also the Service's litigating position before Judge Youngdahl in the Amalgamated Meat Cutters case. See Memorandum in Support of Defendants' Motion to Dismiss at 10; Note, Aliens in the Fields, 21 Stan.L.Rev. 1750, 1755 (1969). But here the Service encountered a well-deserved rebuff. Judge Youngdahl pointed out that the Immigration Act itself defined "residence" as a person's "place of general abode * * * his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a) (33). The language of the Act was obviously irreconcilable with any contention that a commuter's place of employment could constitute a residence. Judge Youngdahl therefore rejected the Service's position. 186 F.Supp. at 118-119.
 
 
 59
 Faced with this check, the Service was obliged "to re-examine the provisions of the 1952 Act, * * * and to adopt a new theory of the legal basis for the commuter practice." Note, supra, 21 Stan.L.Rev. at 1757. Hence, when the commuter practice once again came under attack in Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 330 F. 2d 217 (1964), the Service was ready with the theory it now advances — that the commuter was not required to establish any residence in the United States, either fictitious or actual.
 
 
 60
 Yet even today, the Service's own regulations for the use of Form I-151 are not entirely consistent with the position it espouses in litigation. Unlike the version in force before 1966, the current text of 8 C.F.R. § 211.1(b) (1970) is not totally incompatible with the Service's commuter practice. But the caption to that section, which now includes an anti-strikebreaker clause that the Service concedes to be applicable to commuters, continues to refer to "aliens returning to an unrelinquished lawful permanent residence."
 
 
 61
 I would reverse the judgment below.
 
 
 
 Notes:
 
 
 [1]
 I agree with the majority that it does not impose an undue strain upon the statutory language to hold that a commuter's nightly trips home from his job are "temporary visits abroad."See Part III of the majority opinion.
 
 
 [2]
 The majority does not fully explain the importance to petitioners of their contention that any alien entering the United States must possess a valid visa. According to an I. & N.S. survey, most commuters who enter the United States are farmworkers, general laborers, or domestics, all of whom are in competition with petitionersSee 115 Cong.Rec. 7737-7738 (1969). At the present time the Secretary of Labor will not certify that such workers are in short supply in the United States, or that the admission of aliens for such purposes will not adversely affect wages and working conditions here. 29 C.F.R. § 60(a) (2) (1970). Hence under § 1182(a) (14) of the Act, such aliens are ineligible for visas as special immigrants. Unless they can enter without a visa as commuters, therefore, they cannot enter the United States at all. (Skilled workers, whose trades are in short supply in this country, have no difficulty obtaining visas as special immigrants; elimination of the commuter status would make no difference to them.)
 Petitioners argue, with considerable justice, that the Service's commuter practice constitutes an enormous and unjustifiable loophole in the certification procedure, and makes a shambles of the strong congressional policy of protecting American labor from low-wage foreign competition. They cite statistics showing that wage rates paid to commuters are consistently lower than the rates paid United States residents for the same work. See 115 Cong.Rec. 7738 (1969). Petitioners suggest that even if, strictly as a matter of statutory construction, the language of the Act can be held to support the Service's commuter practice, the longstanding congressional policy requires that this court read the Act so as to protect working people who live here. Since in my view the language of the Act cannot possibly be read to support the Service's contention, I have no occasion to reach these questions of policy.
 
 
 [3]
 Since I believe commuters are not "lawfully admitted for permanent residence," I have no need to decide whether they are immigrants, as the Service contends, or non-immigrants as petitioners urge. Resolution of the question is not of great practical importance. If commuters are non-immigrants, then they may enter only if "unemployed persons capable of performing such service or labor cannot be found in this country. § 1101(a) (15) (H) (ii). If commuters are immigrants, then unless they are lawfully admitted for permanent residence they are special immigrants who may not enter without certification by the Secretary of Labor as discussed in footnote 2,supra. In neither case would the farmworkers, laborers, or domestics whose entry worries petitioners be admissible.
 I note, however, the following difficulties in the argument advanced by the majority for accepting the Service's view:
 (a) The Act makes its own definition of non-immigrants, as it does of immigrants. If commuters fit within the definition of non-immigrants, as they appear to do, then they should be held to be such. It is not a sufficient answer to petitioners' contention to say that commuters a priori are not non-immigrants, and that the definition could hence not have been meant to include them.
 (b) If the only purpose of § 1101(a) (15) (H) (ii) was to codify the bracero program, why did Congress continue to re-enact that program specially for a dozen years after 1952?
 (c) The petitioners do not suggest that § 1101(a) (15) (H) (ii) exactly describes the current commuter practice. They argue that Congress intended commuters to be within § 1101 (a) (15) (H) (ii) and imposed an additional restriction for the protection of American workers. Agreeing with the majority that law and current practice are different, they argue that the Service is breaking the law.
 
 
 [4]
 Nor is it possible, as the majority suggests in another context, to construe Congress's silence in 1965 as endorsement of the Service's disapproval of Judge Youngdahl's decision. True it is that the Service thoughtAmalgamated Meat Cutters wrongly decided and told Congress so. But at the very same time the Service was in administrative proceedings following the decision it disliked. In Matter of Bailey, 11 I. & N.Dec. 466, 467 (1965), the Board of Immigration Appeals agreed with Judge Youngdahl that a commuter was not to be admitted to the United States in the face of an adverse certification by the Secretary of Labor — a view incompatible with the Service's current position that a commuter is an 1101(a) (27) (B) immigrant to whom the certification procedure does not apply. In revising the Secretary of Labor's powers so as to make certification a prerequisite to entry rather than a ground for exclusion, Congress no doubt expected that the Service would continue to follow Judge Youngdahl's decision in Amalgamated Meat Cutters and its own decision in Bailey, and hold that a commuter could not enter unless the Secretary had made the appropriate certification. Specific amendment of § 1101(a) (27) (B) was thus unnecessary.