# SAXBE, ATTORNEY GENERAL, ET AL. v. BUSTOS ET AL.

No. 73–300.   Argued October 17, 1974—Decided November 25, 1974*

Douglas, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Powell, and Rehnquist, JJ., joined. White, J., filed a dissenting opinion, in which Brennan, Marshall, and Blackmun, JJ., joined, *post*, p. 80.

*Together with No. 73–480, *Cardona et al.* v. *Saxbe, Attorney General, et al.*, also on certiorari to the same court.

*Mark L. Evans* argued the cause for petitioners in No. 73–300 and respondents in No. 73–480. With him on the brief were *Solicitor General Bork, Assistant Attorney General Petersen, Deputy Solicitor General Lafontant, Jerome M. Feit,* and *Charles Gordon.*

*Bruce J. Terris* argued the cause for respondents in No. 73–300 and petitioners in No. 73–480. With him on the brief were *John W. Karr* and *Joseph Onek.*†

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Some aliens who have their homes in Canada or Mexico commute *daily* to places of employment in this country and others do so on a *seasonal* basis, a practice permitted by the Immigration and Naturalization Service. The question is whether the practice on the facts of these cases conforms with the Immigration and Nationality Act. It turns on the meaning of § 101 (a)(27)(B), 66 Stat. 169, as amended, 79 Stat. 916, 8 U. S. C. § 1101 (a)(27)(B), which defines as one variety of "special immigrant" an immigrant "lawfully admitted for permanent residence, who is returning from a temporary visit abroad."

Those who qualify under § 1101 (a)(27)(B) may be permitted entry without the usual documentation requirements. 8 U. S. C. § 1181 (b). The regulations [1] implement § 1181 (b) by allowing such an immigrant to use an alien registration receipt card, normally called a "green card," in lieu of an immigrant visa and without

---

†Briefs of *amici curiae* were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; by *Ronald H. Bonaparte, John A. Joannes, Milton C. Gelenian, Thomas F. Olson,* and *Allen Lauterbach* for the American Farm Bureau Federation et al.; and by *Richard D. Maltzman* and *Philip B. Bass* for Bud Antle, Inc.

[1] 8 CFR § 211.1 (b)(1).

regard to numerical limitations [2] if he is "returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad not exceeding 1 year."

The Act presumes that an alien is an immigrant "until he establishes . . . that he is entitled to a nonimmigrant status"; [3] and it defines "immigrant" as every alien who cannot bring himself into an enumerated class of nonimmigrants.[4] One class of nonimmigrants [5] is "an alien having a residence in a foreign country which he has no intention of abandoning . . . (ii) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country."

An alien does not qualify as a *nonimmigrant* under this class of nonimmigrants if he seeks to perform temporary labor at a time when unemployed persons capable of performing that labor can be found in this country.[6] If he cannot qualify as a nonimmigrant some other way, such an alien is subject to the Act's numerical limitations, unless he is included in the classes of "immediate relatives" of a United States citizen or "special immigrants." [7] On the other hand, as already noted, one variety of "special immigrant" is an alien "lawfully admitted for permanent residence, who is returning from a temporary visit abroad." [8] One who so qualifies is excluded

---

[2] 8 U. S. C. §§ 1181 (a) and 1151–1153.

[3] § 1184 (b).

[4] § 1101 (a) (15).

[5] § 1101 (a) (15) (H). Legislation proposed in 1973 would limit the stay of these nonimmigrants to one year with possible extension to two years. H. R. Rep. No. 93–461, p. 16 (1973).

[6] 8 U. S. C. § 1101 (a) (15) (H) (ii).

[7] § 1151 (a).

[8] § 1101 (a) (27) (B). The 1973 House Report, *supra*, n. 5, at 16, recognizes the difference between a "special immigrant" and nonimmigrants covered by § 1101 (a) (15) (H).

from the labor certification provisions in 8 U. S. C. § 1182 (a) (14).[9] The term "lawfully admitted for permanent residence" is defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant . . . , such status not having changed." [10] An alien achieves that *status* in the first instance by complying with any applicable numerical limitations and with the Act's other requirements for admission, details not important here. After his initial admission on that basis, he is free to leave this country temporarily and to re-enter without regard to numerical limitations. The Act authorizes the Attorney General to re-admit such an alien without a visa or other formal documentation. § 1181 (b). He has exercised that authority, allowing such an immigrant to return with what was called in the briefs and oral argument the "green card."

This suit was brought by the United Farm Workers Organizing Committee[11] for declaratory and injunctive

---

[9] Title 8 U. S. C. § 1182 (a) (14) provides:

"(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

.        .        .        .        .

"(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

[10] § 1101 (a) (20).

[11] A collective-bargaining agent for farmworkers. Two farm laborers were also plaintiffs and four more intervened in the District

relief against the practice of giving alien commuters the documentation and labor certification benefits of classification as immigrants "lawfully admitted for permanent residence" who are "returning from a temporary visit abroad." [12]    The District Court dismissed the action without opinion.   The Court of Appeals held that the admission of *daily* commuters was proper but that the admission of *seasonal* commuters was not, 156 U. S. App. D. C. 304, 481 F. 2d 479 (1973).   We granted the petition and cross-petition in light of a conflict between the decision below and that of the Court of Appeals for the Ninth Circuit in *Gooch* v. *Clark,* 433 F. 2d 74 (1970).

Our conclusions are that commuters are immigrants, that they are "lawfully admitted for permanent residence," and that they are "returning from a temporary visit abroad" when they enter the United States.   Moreover, the wording and legislative history of the statute and the long administrative construction indicate that the same treatment is appropriate for both daily and seasonal commuters.   Commuters are thus different from those groups of aliens who can be admitted only on certification by the Secretary of Labor that unemployed persons cannot be found in this country and that the employment of the aliens "will not adversely affect the wages and working conditions of the workers in the United States." 8 U. S. C. § 1182 (a)(14).   We thus agree with the con-

---

Court.   The parties herein are referred to as they were in the District Court.

[12] In the District Court and the Court of Appeals plaintiffs also argued that 8 CFR § 211.1 (b)(1) should be read to preclude the entry of a commuter to work at a place where a labor dispute exists, even if the commuter has previously been employed there.   This claim was not decided by the Court of Appeals and was not presented in plaintiffs' petition for certiorari.   Hence we offer no views on the merits of this claim.

clusion of the Ninth Circuit in *Gooch*. Accordingly, we affirm the judgment now before us as respects *daily* commuters and reverse it as respects *seasonal* commuters.

A main reliance of plaintiffs is on the provision of the Act [13] which in the much-discussed subsection (15) (H)(ii) provides that one category of alien nonimmigrant is "an alien having a residence in a foreign country which he has no intention of abandoning . . . (ii) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country." Under the argument tendered, these alien commuters partially meet the definition of nonimmigrants in subsection (15)(H)(ii) in that they have a foreign residence which they do not intend to abandon and come here temporarily to perform temporary service, but fail to satisfy subsection (15)(H)(ii) completely in that they do not show that unemployed people capable of performing the services cannot be found in this Nation. That should invoke the presumption in the Act, already noted, that an alien is an immigrant until or unless he proves he is a nonimmigrant.[14]

We agree, moreover, with the Ninth Circuit that this provision "was intended to confer nonimmigrant status on certain aliens who were needed in the American labor force but who, unlike commuters, would be unable to achieve admittance under immigrant status." 433 F. 2d, at 78. The administrative construction of this subsection (15)(H)(ii) by the Immigration Service [15] has been that it does not cover an alien, like the commuter, who has a "permanent residence" here and who comes to perform a job of a permanent character, even though the

---

[13] 8 U. S. C. § 1101 (a)(15)(H).

[14] § 1184 (b).

[15] *Matter of Contopoulos,* 10 I. & N. Dec. 654 (1964).

period of his service is limited. To repeat, the Act provides that "[e]very alien shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer . . . and the immigration officers . . . that he is entitled to a nonimmigrant status under section 1101 (a) (15)." [16] Before an alien can be classified as a *nonimmigrant* under subsection (15)(H)(ii) his prospective employer must submit a petition on his behalf under 8 U. S. C. § 1184 (c); and after the INS approves the petition, the alien must apply for *nonimmigrant* status and demonstrate that he in fact qualifies for that status.[17]

We conclude that commuters are not nonimmigrants under subsection (15)(H)(ii). None of the other categories of nonimmigrants are applicable, and thus under § 1184 (b) the commuters are immigrants.

The fact that an alien commuter who has not shown he must be classified as a *nonimmigrant* must be classified as an immigrant is not the end of our problem. The question remains whether he may properly be treated as one who is in the group defined as "special immigrants" under subsection (27)(B),[18] that is, whether commuters are "lawfully admitted for permanent residence" when they have no actual residence in this country.

Section 1101 (a)(20) defines "lawfully admitted for permanent residence" as "the *status* of having been lawfully accorded the *privilege* of residing permanently in the United States as an immigrant in accordance with the immigration laws, such *status* not having changed" (italics added). The definition makes the phrase descriptive of a *status* or *privilege* which need not be reduced to a permanent residence to be satisfied, so long as that *status* has not changed.

---

[16] 8 U. S. C. § 1184 (b).

[17] 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.14b (rev. ed. 1974).

[18] The subsection is in 8 U. S. C. § 1101 (a).

One argument of the plaintiffs is that the *status* has changed because residence in this country was never claimed. But we read the Act as did the Ninth Circuit in the *Gooch* case to mean that the change in *status* which Congress had in mind was a change from an immigrant lawfully admitted for permanent residence to the status of a *nonimmigrant* pursuant to 8 U. S. C. § 1257. 433 F. 2d, at 79.

The *status* referred to in § 1101 (a)(20) is acquired when an alien satisfies (1) any numerical limitations on the entry of immigrants,[19] (2) requirements as to qualitative matters such as health, morals, and economic status,[20] and (3) the need for an immigrant visa.[21] The applicant must also state whether he plans to remain in the United States permanently.[22] But the Act does not declare or suggest that the *status* will be denied him, if he does not intend to reside permanently here. As we read the Act, the *"status"* acquired carries several important privileges: He may remain in the United States indefinitely; he is free to work in this country; he may return to this country after a temporary absence abroad; and he has the privilege of establishing a permanent residence in the United States.

Thus we conclude that commuters are immigrants "lawfully admitted for permanent residence." As did both the majority and dissent in *Gooch,* we also find that commuters can be viewed as "returning from a temporary visit abroad." 433 F. 2d, at 79–81, 82 n. 1. The court below so agreed as respects daily commuters, disagreeing only as to seasonal commuters. Neither the court below nor the Court of Appeals in *Gooch* took the position now taken in dissent here.

---

[19] 8 U. S. C. § 1151 (a).

[20] § 1182.

[21] §§ 1181 (a), 1201.

[22] § 1202 (a).

Our conclusion reflects the administrative practice, dating back at least to 1927 when the Bureau of Immigration was a part of the Department of Labor.[23]   In 1940 the Bureau was transferred to the Department of Justice [24] where it remains today.   On April 1, 1927, it issued General Order No. 86.[25]   Under the order, commuters were

---

[23] See 32 Stat. 826; 34 Stat. 596; c. 141, 37 Stat. 736.

[24] By then it was called the Immigration and Naturalization Service. Reorganization Plan No. V, 54 Stat. 1238.

[25] General Order No. 86 reads as follows:

"Subject: Land border crossing procedure

"1. Hereafter aliens residing in foreign contiguous countries and entering the United States to engage in existing employment or to seek employment in this country will not be considered as visiting the United States temporarily as tourists, or temporarily for business or pleasure, under any provisions of the Immigration Law which exempt visitors from complying with certain requirements thereof; that is, they will be considered as aliens of the 'immigrant' class.

"2. However, the following aliens of the said 'immigrant' class residing in foreign contiguous countries and who are now enjoying the border crossing privilege may continue so to enjoy it upon the payment of head tax, provided such head tax was assessible [sic] on aliens entering permanently at the time of original admission and, provided further, that they are not coming to seek employment.

"A. Aliens whose original admission occurred prior to June 3, 1921.

"B. Natives of nonquota countries whose original admission occurred prior to July 1, 1924.

.    .              .              .              .

"3. Aliens of all nationalities of the 'immigrant' class whose original admission occurred subsequent to June 30, 1924, will be required to meet all provisions of the Immigration Laws applying to aliens of the 'immigrant' class. Aliens of this class already enjoying the border crossing privilege, however, will be granted a reasonable time, not to exceed six months from July 1, 1927, within which to obtain immigration visas and otherwise comply with the laws.

"4. Aliens who have already complied with the requirements of the Immigration Laws and this General Order may be permitted to continue to enjoy the border crossing privilege.

"5. Aliens who have complied with the requirements of this General

required to gain admission as immigrants before they could have border crossing privileges. The order provides that "[a]liens who have complied with the requirements of this General Order governing permanent admission will be considered as having entered for permanent residence." "Thus," said the Court of Appeals in the instant cases, "the daily commuter was born," 156 U. S. App. D. C., at 304, 481 F. 2d, at 485.

This longstanding administrative construction is entitled to great weight, particularly when, as here, Congress has revisited the Act and left the practice untouched. Such a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language. *Massachusetts Trustees* v. *United States,* 377 U. S. 235 (1964); *United States* v. *Midwest Oil Co.,* 236 U. S. 459 (1915). As the defendants below acknowledge, the meaning of the phrase "lawfully admitted for permanent residence" in § 1101 (a)(27)(B) may not be identical to the meaning of the same language in other sections of the

---

Order governing permanent admission will be considered as having entered for permanent residence.

"6. The use and issuance of identification cards to all classes of aliens entitled to same will continue as heretofore.

"7. Identification cards held by or issued to aliens of the 'immigrant' class shall be rubber-stamped as follows:

"IMMIGRANT

.     .     .     .     .

"10. All identification cards heretofore issued, held by aliens who cannot, or do not, meet the requirements of law, regulations and this order, will be taken up and canceled upon an incoming trip of the holder and appropriate action taken.

.     .     .     .     .

"12. The status of holders of identification cards shall be inquired into periodically . . . . When the holder of a 'nonimmigrant' identification card qualifies as an 'immigrant,' a new identification card shall be issued, stamped to show the correct status."

Act where the same history of administrative construction is not present.

We see no difference in the treatment of *daily* commuters and *seasonal* commuters. The status of the *seasonal* commuter is the same as the status of the *daily* commuter because the identical statutory words cover each. The Court of Appeals, however, rested essentially on a different legislative history of *seasonal* commuters than had obtained in cases of *daily* commuters.

Prior to 1917 there were essentially no limitations on the practice of commuting from Mexico or Canada to the United States. Legislation was passed in 1917, 1921, and 1924.[26] But under those statutes commuters remained able freely to cross the border subject only to qualitative restrictions in the 1917 Act.

As already noted, the administrative approach changed in 1927 when the Bureau of Immigration issued its General Order No. 86. While the 1952 Act, 66 Stat. 163, made no mention of commuters and while the 1965 amendments of the 1952 Act, 79 Stat. 911, were likewise silent as respects commuters, the Court of Appeals assumed that the longstanding practice of allowing *daily* commuters was not repealed *sub silentio;* and we agree. The Court of Appeals, however, took quite a different view of the *seasonal* commuter problem because of its different history.

The *seasonal* commuter problem dates back at least to 1943 when this Government and Mexico agreed to the seasonal importation of Mexican agricultural workers. 56 Stat. 1759. Congress legislated on the problem in 1951,[27] requiring farmers in this Nation to make reasonable efforts to attract domestic workers prior to certification by the Secretary of Labor of the need for foreign labor.

---

[26] C. 29, 39 Stat. 874; 42 Stat. 5; c. 190, 43 Stat. 153.
[27] 65 Stat. 119.

That was known as the *bracero* program and the Court
of Appeals called the *seasonal* commuter merely a new
name for the former *bracero*. That is quite inaccurate.
The *braceros* were at the start *nonimmigrants;* the *sea-
sonal* commuters were immigrants. Some *braceros,* in-
deed quite a few, H. R. Rep. No. 722, 88th Cong., 1st Sess.,
7 (1963), acquired permanent residence status. The *sea-
sonal* commuter, like the *daily* commuter, has always
been in that category.

In 1964 the *bracero* type of *seasonal* program lapsed;
and the next year Congress amended the Immigration and
Nationality Act by making stricter the certification by
the Secretary of Labor of the need for foreign labor and
requiring findings on the lack of any adverse effect of the
employment of aliens on the wages and working condi-
tions of workers in this country.

But that provision, which we have quoted,[28] does not
apply to aliens lawfully admitted for permanent residence
returning from a temporary visit abroad and to certain
close relatives. An alien who first sought admission
*after the effective date of the 1965 Amendment* would
need a certificate of the Secretary of Labor; but if he al-
ready was an alien lawfully admitted to the United States
for permanent residence and returning from a temporary
visit abroad, the 1965 amendments would not affect him.
The purpose of Congress was to limit *new* admissions of
alien laborers, not to prejudice the *status* of aliens who,
whether *daily* or *seasonal* commuters, had acquired per-
manent residence here and were returning to existing
jobs.[29]

---

[28] N. 9, *supra*. See 1 Gordon & Rosenfield, *supra*, n. 17, § 2.40.

[29] We find in the reports on the 1965 Act no suggestion that the
commuter program was to be uprooted in its entirety, S. Rep. No.
748, 89th Cong., 1st Sess. (1965). That report emphasizes the pur-
pose to prevent an "influx" of foreign labor, not to destroy existing
labor arrangements. *Id.,* at 15.

We have mentioned General Order No. 86 issued on April 1, 1927, which treated the commuters as immigrants (not *nonimmigrants*), who on obtaining their admission cards would be "considered as having entered for permanent residence." [30]   Cf. *Karnuth* v. *United States ex rel. Albro,* 279 U. S. 231, 244 (1929).[31]   The thrust of General Order No. 86 was to lift aliens who were natives of Canada and Mexico from the quota provisions for *nonimmigrants.* Thus, they entered from that time down to date, with nonquota immigration documents. That regulation was carried forward in various regulations before 1952.[32]   The practice was reviewed and sustained in various published administrative decisions.[33]   Some suggested that the 1952 Act eliminated the alien commuter. The Board of Immigration Appeals, however, reaffirmed the validity of the practice. *Matter of H ——— O ———,* 5 I. & N. Dec. 716 (1954). Thereafter repeated administrative decisions [34] affirmed the adherence to the alien-commuter concept. We do not labor the administrative construction phase of these cases further, because when the 1952 Act was reported, the Senate Judiciary Committee tendered a voluminous report of

---

[30] For the text of General Order No. 86 see n. 25, *supra.*

[31] The aliens in *Karnuth* wanted to be treated as nonimmigrants. One of the categories of nonimmigrants under § 3 of the Immigration Act of 1924, 43 Stat. 154, was defined as "an alien visiting the United States temporarily . . . for business or pleasure." The Court held they did not qualify as laborers for hire.

[32] Immigration Rules and Regulations, Jan. 1, 1930, Rule 3, Subd. C; 8 CFR § 3.6 (1939); 8 CFR § 110.6 (1947).

[33] *Matter of D ——— C ———,* 3 I. & N. Dec. 519 (1949); *Matter of L. ———,* 4 I. & N. Dec. 454 (1951).

[34] *Matter of M ——— D ——— S ———,* 8 I. & N. Dec. 209 (1958); *Matter of Bailey,* 11 I. & N. Dec. 466 (1966); *Matter of Burciaga-Salcedo,* 11 I. & N. Dec. 665 (1966); *Matter of Gerhard,* 12 I. & N. Dec. 556 (1967); *Matter of Wighton,* 13 I. & N. Dec. 683 (1971); *Matter of Hoffman-Arvayo,* 13 I. & N. Dec. 750 (1971).

nearly 1,000 pages touching on the alien commuters, describing the practice in some detail, and including the sections which we have discussed in this opinion. The commuters from Canada and Mexico were treated as lawfully admitted immigrants. No doubt as to the desirability of the practice was expressed. It is clear that S. Rep. No. 1515, 81st Cong., 2d Sess. (1950) (the Omnibus Study Report), reveals a congressional acceptance of the system.

The changes relevant to commuters in the 1965 amendments were, as stated in *Gooch*, minor and technical and contain no suggestion of a change in the commuter problem, 433 F. 2d, at 80–81. H. R. Rep. No. 745, 89th Cong., 1st Sess. (1965); S. Rep. No. 748, 89th Cong., 1st Sess. (1965).

Since 1965 there have been numerous reports by committees of the Congress on the alien commuter problem which indicate that Congress is very knowledgeable about the problem and has not reached a consensus that the administrative policy reaching back at least to General Order No. 86 is wrong. We know from the Western Hemisphere Report [35] that the dimensions of the problem are considerable. Daily commuters from Mexico number more than 42,000 of whom 25,000 are engaged in occupations other than agriculture. The total of Canadian commuters exceeds 10,000. Seasonal commuters number at least 8.300 according to the Service's estimate. The United States Commission on Civil Rights estimates that if Mexican commuters were cut off, they would lose $50

---

[35] Report of Select Commission on Western Hemisphere Immigration 104 (1968). See S. Rep. No. 91–83. p. 65 (1969), stating that the alien commuter problem "can be resolved not by drastically putting an end to the commuter system, but by refining its current operations." See Hearings on H. R. 9112, H. R. 15092, H. R. 17370 before Subcommittee No. 1 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 205–207.

million annually.[36]   The State Department estimates there are 250,000 family members dependent on income earned by commuters [37] and that commuters account for 25% to 30% of the income earned by the labor force in some Mexican border communities.[38]   Termination of the alien commuter practice might well have a great impact on American border communities because the Mexicans who have the *status* of permanent residents could settle here, increasing the problems of housing and education in the border towns this side of the Rio Grande. Former Secretary of State Rogers submitted to the District Court an affidavit stating that any "sudden judicial termination of the commuter system, displacing the present immigrant commuters, would have a serious deleterious effect upon our relations with both Mexico and Canada."

Our conclusion is twofold.   First, the provisions of the Act which sanction *daily* commuters are the ones that also support *seasonal* commuters.   We would have to read the same language in two opposed ways to sanction the *daily* commuter program and strike down the *seasonal* commuter program.   There is no difference in administrative treatment of the two classes of commuters.

Second, if alien commuters are to be abolished or if *seasonal* commuters are to be treated differently from *daily* commuters, the Congress must do it.   The changes suggested implicate so many policies and raise so many problems of a political, economic, and social nature that it is fit that the Judiciary recuse itself.   At times judges must legislate "interstitially" to resolve ambiguities in

---

[36] Stranger in One's Land 12 (Clearinghouse Publication No. 19, 1970).

[37] Statement of Assistant Secretary of State Oliver to the Senate Subcommittee on Immigration, Sept. 25, 1967, p. 6.

[38] *Id.,* at 4.

laws. But the problem of taking all or some alien commuters engaging in farm work out of the Act is not "interstitial" or, as Mr. Justice Holmes once put it, "molecular." [39] It is a massive or "molar" action for which the Judiciary is ill-equipped.

We affirm the Court of Appeals insofar as it held *daily* commuters are lawfully admitted and reverse it insofar as *seasonal* commuters are concerned.

*So ordered.*

MR. JUSTICE WHITE, joined by MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN, dissenting.

The Court, in reaching an interpretation of the immigration statutes which permits a finding that daily and seasonal commuters from Mexico and Canada are "special immigrants" not subject to documentation and numerical restrictions upon entry to this country, contravenes one of the cardinal principles of statutory construction: "administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction." *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 315 (1933) (Cardozo, J.). Administrative construction over a long period of time is an available tool for judicial interpretation of a statute *only* when the statutory terms are doubtful or ambiguous. *United States* v. *Southern Ute Indians,* 402 U. S. 159, 173 n. 8 (1971); *Estate of Sanford* v. *Commissioner,* 308 U. S. 39, 52 (1939); *Norwegian Nitrogen Products Co.* v. *United States, supra.* In light of the characteristics of the aliens whose status is in question and the ordinary meaning of

---

[39] "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 221 (1917) (dissenting opinion).

the very specific terms Congress used in these immigration statutes, this principle applies with force here.

## I

Daily and seasonal commuters both reside *in fact* in either Mexico or Canada and cross the border into this country either daily or seasonally to work.[1] The daily commuter's defining characteristic is his limited presence in this country; he comes across the border to work each day and returns to his actual dwelling place in Mexico or Canada when his work is done. The seasonal commuter, in contrast, remains in this country continuously during the seasons in which he works here, but then absents himself completely for the remaining portions of the year. For the Court to reach its result, it must undertake the unlikely project of demonstrating that these aliens are in legal effect *permanent residents* of the United States under the immigration laws.

To qualify as a "special immigrant" given dispensations from normal documentation requirements and numerical limitations, a commuter must be "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." 8 U. S. C. § 1101 (a)(27)(B). The included phrase "lawfully admitted for permanent residence" means in turn "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." § 1101 (a)(20). The immigration laws define "perma-

---

[1] Counsel for the federal parties (hereinafter the Government) indicated at oral argument that commuters actually form a spectrum rather than two hard-and-fast categories. Some commuters stay in this country for whole seasons and then switch later to daily commuting. Some daily commuters come across the border less regularly than every workday, and sometimes seek only temporary employment and switch employers. Tr. of Oral Arg. 18, 52, 54.

nent residence" as "the place of general abode," a person's "principal, actual dwelling place in fact, without regard to intent," § 1101 (a)(33), with the relationship of the person to the place of residence being "of continuing or lasting nature, as distinguished from temporary . . . ." § 1101 (a)(31). Under the Immigration and Naturalization Service's own regulations, in order to be exempt from the normal documentation requirements upon entry, an alien must be returning to his "unrelinquished lawful permanent residence" from a "temporary absence abroad." 8 CFR § 211.1 (b)(1). On its face, the present practice of the Service is flatly contrary to its own regulation.

Confronted with the obvious difficulty that this statutory language defining permanent resident status and the regulations will not accommodate the daily and seasonal commuters,[2] the majority, without the aid of legislative history, contends that these plain words should be given special, technical meanings:

> "Section 1101 (a)(20) defines 'lawfully admitted for permanent residence' as 'the *status* of having been lawfully accorded the *privilege* of residing permanently in the United States as an immigrant in accordance with the immigration laws, such *status* not having changed' (italics added). The definition makes the phrase descriptive of a *status* or *privilege* which need not be reduced to a permanent residence

---

[2] Strain between the statute and the administrative practice is also evident in the need for the Government to fit the daily commuter's trip each day from his *home* in Mexico or Canada to his workplace in this country as a return to this country "from a temporary *visit abroad.*" 8 U. S. C. § 1101 (a)(27)(B) (emphasis added). As indicated in the text, the regulations refer to a return to "an unrelinquished lawful permanent residence" in this country from "a temporary absence abroad . . . ." 8 CFR § 211.1 (b).

to be satisfied, so long as that *status* has not changed."
*Ante,* at 71 (italics supplied by the Court).

The use of italics will not alter the ordinary meaning of the statutory terminology, however, and the Court gives no basis for believing that Congress intended something other than the ordinary meaning of the words it used. No one could reasonably suggest that Congress was seeking to accommodate the commuters when it enacted these definitions and to provide special status to those who do not reside and do not intend to reside in this country. Clearly it was dealing with those aliens who seek permanent-resident status in this country and who fulfill that intention.

Since the language of the statute simply will not bend to allow the proposition which the Government and the Court adopt—that in defining "lawfully admitted for permanent residence" Congress meant to include persons who have never intended to reside permanently in this country, who do not currently reside in this country, and who never will become actual permanent residents [3]—the ultimate rationale for the decision must be that the plain

---

[3] In an effort to make the facts fit the statute, the Court of Appeals found that the commuter's place of work could be considered his permanent residence. 156 U. S. App. D. C. 304, 311, 481 F. 2d 479, 486 (1973). Others have noted the "logical inconsistency" and the lack of a precise fit between the practice and the law but have justified the discordance by citing "practical needs and considerations of foreign policy." 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.19, p. 2–105 (1973 Cum. Supp.). The practice has been viewed as an "amiable fiction" and the product of "administrative ingenuity." *Id.,* § 2.8b, p. 2–43 (1974). The Board of Immigration Appeals has similarly acknowledged that the commuter practice "manifestly does not fit into any precise category found in the immigration statutes" and that "[t]he status is an artificial one, predicated upon good international relations maintained and cherished between friendly neighbors." *Matter of M —— D —— S ——,* 8 I. & N. Dec. 209, 213 (1958).

meaning of the statute has been changed by a longstanding administrative practice accepted by Congress as the appropriate construction.[4]

## II

Administrative construction of a statute which conflicts with the express meaning of the statutory terms can be viewed as authoritative only if it appears that Congress has in fact accepted that construction, and the burden of proof necessarily is on the proponent of the administrative view. Since "[c]ongressional inaction frequently betokens unawareness, preoccupation, or paralysis," *Zuber* v. *Allen*, 396 U. S. 168, 185–186, n. 21 (1969), congressional silence standing alone cannot constitute congressional acceptance of a continuing administrative practice. The Court, however, elevates such silence to acquiescence by stressing proof of the practice and the absence of any indication that Congress has "repealed" it. *Ante*, at 75.

The administrative practice of treating daily commuters as immigrant aliens began in 1927 with the Depart-

---

[4] The effect of the Court's decision is not only to stretch the meaning of the statute so as to include commuters within the permanent resident status, but also to throw into question the meaning of "permanent resident" throughout the immigration laws with obvious anomalous consequences. See *Gooch* v. *Clark*, 433 F. 2d 74, 83–85 (CA9 1970) (Wright, J., dissenting). For example, the "spouses, unmarried sons or unmarried daughters of an alien lawfully admitted for permanent residence" are included in the second preference group for immigration visas. 8 U. S. C. § 1153 (a)(2). Thus a commuter's immediate kin are perhaps eligible for a preference although the commuter may himself have been entitled to no preference. The Government suggests that the commuter's status for other purposes is not before the Court and need not be decided. Brief for Federal Parties 28. But the Court should be reluctant to accept an invitation to make an *ad hoc* decision with respect to one aspect of a statutory definition where it is clear that the definition is a central one which Congress has provided with the intent of having it applied generally.

ment of Labor's General Order No. 86.[5]  Since Mexicans
and Canadians were not subject to numerical limitations
on entry into this country, this classification of the com-
muters had no practical effect upon them; informal docu-
mentation requirements were followed.[6]  It was not until
1952 that Congress enacted a provision which could have
limited the entry of commuters.  Under § 212 (a)(14) of
the 1952 Act, 66 Stat. 183, Congress provided that an
immigrant could not enter if the Secretary of Labor cer-
tified that there were sufficient domestic workers available
in his field of work or that his entry would have an ad-
verse impact on the wages or working conditions of do-
mestic workers.  In 1965, Congress tightened this re-
striction by providing that aliens were inadmissible un-
less the Secretary of Labor certified that there were in-
sufficient domestic workers available in the field and that
the employment of aliens would not adversely affect
wages and conditions of American workers.  8 U. S. C.
§ 1182 (a)(14).[7]  In another 1965 amendment, Congress

---

[5] See the relevant text of General Order No. 86, *ante*, at 73–74, n. 25.

[6] The Court's opinion suggests that General Order No. 86 removed
commuters from quota restrictions applicable to nonimmigrants.
*Ante*, at 77.  But Mexican and Canadian commuters had not been
subject to any quotas.  The Immigration Act of 1924 imposed no
quotas on nonimmigrants, and Mexicans and Canadians were not
subject to immigrant quotas.  43 Stat. 153.  The General Order was
designed primarily to prevent *quota* aliens from entering this country
through Canada and Mexico as nonimmigrants.  Letter from Secre-
tary of Labor, dated Nov. 26, 1928, in App. A of H. R. Rep.
No. 2401, 70th Cong., 2d Sess., 5–10 (1929).  Informal documenta-
tion was maintained despite the classification of the commuters as
immigrants because the immigration authorities did not view Con-
gress as intending to interfere with the practice of border crossings
by commuters.  Report of Select Commission on Western Hemi-
sphere Immigration 101–102 (1968).

[7] The Secretary of Labor has not issued a certification allowing the
entry of aliens seeking employment as farm laborers.  29 CFR
§§ 60.2 (a)(2), 60.7 (Schedule B).

imposed the first quota on immigration from the Western Hemisphere, effective in 1968.[8]

There can be no reasonable presumption, therefore, that prior to 1952 Congress concerned itself with the propriety of the administrative classification of daily commuters under the immigration statutes.[9]  Only with the passage of the 1952 legislation and subsequent amendments was there evidence of some possible concern on the part of Congress with the number of Mexican and Canadian aliens entering this country to work.  Thus if Congress both expressed concern at the influx of alien workers but approved the commuter practice, then the Court's conclusion of congressional acquiescence in the administrative construction would have some persuasive force.  Since that construction conflicts with the meaning of the statute on its face, however, something more than silence is required to establish acquiescence.  Cf. *Leary* v. *United States*, 395 U. S. 6, 24–25 (1969).  The only evidence of congressional acceptance cited by the Court is a brief description of the prior practice with respect to commuters contained in an extremely extensive report of an investigation of this Nation's immigration system published by the Senate Judiciary Committee in 1950.[10]

---

[8] § 21 (e), 79 Stat. 921.

[9] The Government refers to the inclusion in an early draft of a House bill, H. R. 5138, which ultimately became the Alien Registration Act of 1940, of a provision which would have prohibited any alien from entering this country from Mexico or Canada for the purposes of working or seeking employment.  Hearing on H. R. 5138 before Subcommittee No. 3 of the House Committee on the Judiciary, 76th Cong., 1st Sess., ser. 3, p. 3 (1939).  The deletion of that provision prior to the reporting of the bill does not signal congressional approval of the administrative classification of commuters, but rather, as with the absence of quotas restricting the entry of Mexicans and Canadians, an unwillingness to restrict such entry which persisted at least until 1952.

[10] S. Rep. No. 1515, 81st Cong., 2d Sess., 535–536, 616 (1950).

The fact that "[n]o doubt as to the desirability of the practice was expressed," *ante,* at 78, will not overcome the fact that the terms of the statute passed two years later are incompatible with that practice, and neither the Court nor the Government can point to any express congressional acceptance of that practice in spite of the incompatibility.[11] The Court does say that since 1965 there have been numerous committee reports indicating congressional knowledge of the commuter problem and that Congress "has not reached a consensus that the administrative policy . . . is wrong." *Ibid.* But the Court has clearly, and erroneously, placed the burden upon Congress to show that it has not accepted the practice rather than on the administrative agency to establish that Congress has acquiesced.

Very recently, in noting an exception to the principle of giving great weight to an administrative construction of a statute, we said that "an agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 745 (1973). But the Court has allowed an agency to do so in this case.[12]

---

[11] The Government concedes that the seasonal commuter practice grew after the *bracero* program had lapsed. Tr. of Oral Arg. 53; Brief for Federal Parties 75. See also Gordon, The Amiable Fiction—Alien Commuters Under Our Immigration Laws, in Employment of "Green Card" Aliens During Labor Disputes, Hearings on H. R. 12667 before the Special Subcommittee on Labor of the House Committee on Education and Labor, 91st Cong., 1st Sess., 181, 183 (1969). Therefore, there is even less reason for believing that Congress acquiesced in the administrative classification of seasonal commuters.

[12] The majority cites *Massachusetts Trustees* v. *United States,* 377 U. S. 235 (1964), and *United States* v. *Midwest Oil Co.,* 236 U. S. 459 (1915), in support of its rationale of statutory construction. *Ante,* at 74. A comparison of the statutes and facts of those cases

## III

The majority acknowledges the many political, economic, and social implications of the issues in this case and the need for the Court to legislate only when interstitial ambiguities in a statute require resolution, but it then rests its rejection of these unambiguous provisions of the immigration laws upon legislative considerations: the economic consequences to the alien commuters and to their communities of finding that the administrative practice is not consistent with the statute, the possible impact upon American border communities if those commuters who are legally capable of doing so choose to

---

with the situation here, however, graphically reveals the extent of the majority's departure from accepted canons of construction.

In *Massachusetts Trustees* the Court was faced with the problem of harmonizing apparently inconsistent sections of the same statute governing an agency's authority. The literal language of the statute was found insufficiently precise to dispose of the question. Under these circumstances, the Court looked to the agency's practice, which could be given "some weight"; but the successive extensions by Congress of the agency's authority in the face of the agency's prior practice was not, even then, to be controlling. 377 U. S., at 241–245.

In *Midwest Oil Co.* the Presidential power to withdraw public lands from private acquisition which Congress by legislation had made free and open to occupation and purchase was found in the hundreds of such withdrawal orders, beginning in the early years of the Government, which had not been repudiated by Congress. In addition, the Executive Order in question was issued seven years after the Secretary of the Interior, in response to a resolution of the Senate calling for information as to the authority for such withdrawals, sent to the Senate a report which cited the longstanding practice and the Executive's claim of authority. Congress took no action to repudiate that claim. Legislation soon after the order in question authorized such withdrawals by the President prospectively, expressed no intention on the part of Congress to repudiate past withdrawals, and left the question of the validity of past withdrawals to the courts. 236 U. S., at 469–471, 480–483. Nothing in this case remotely resembles the historical record upon which congressional acquiescence was premised in *Midwest Oil Co.*

take up actual residence in this country, and the need to avoid negative effects upon this country's relations with Mexico and Canada. *Ante,* at 78–79. But these interests, as well as the opposing interests of domestic labor, form part of the congressional calculus, and this Court is hardly equipped or authorized to predict by its decision the direction in which that balance of interests will ultimately tip. Because I believe that the Court has strayed from the neutral judicial function of applying traditional principles of statutory construction, I must respectfully dissent.