667 F.2d 215
 16 ERC 1857, 12 Envtl. L. Rep. 20,115
 TOWN OF BROOKLINE, et al., Petitioners,
v.
Anne McGill GORSUCH, Administrator of the United States
Environmental Protection Agency, et al., Respondents.
President and Fellows of Harvard College, Intervenor.
 No. 81-1360.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 9, 1981.
Decided Dec. 18, 1981.
 
 Jerome Aaron, Cambridge, Mass., for The Mission Hill petitioners.
 Thomas B. Bracken, Boston, Mass., with whom J. Raymond Miyares and Bracken & Baram, Boston, Mass., were on brief, for Brookline petitioners.
 Jose R. Allen, Atty., Dept. of Justice, Washington, D.C., with whom Anthony C. Liotta, Acting Asst. Atty. Gen., Land and Natural Resources Div., Donald W. Stever, Jr., Atty., Dept. of Justice, Washington, D.C., and Susan Studlien, Atty., E. P. A., Boston, Mass., were on brief, for Federal respondents.
 Robert W. Meserve, Boston, Mass., with whom Palmer & Dodge, Verne W. Vance, Jr., and Foley, Hoag & Eliot, Boston, Mass., were on brief, for respondent Medical Area Total Energy Plant, Inc. and intervenor President and Fellows of Harvard College.
 Before CAMPBELL and BOWNES, Circuit Judges, and CAFFREY,* District Judge.
 BOWNES, Circuit Judge.
 
 
 1
 The Town of Brookline, Massachusetts (Brookline), and the Mission Hill Planning Commission, Inc., and residents of the Mission Hill area of Boston (Mission Hill)[1] petition us to review a determination of the acting Regional Administrator (ARA) of the Environmental Protection Agency (EPA) that diesel engines to be installed in a cogeneration plant being constructed in Brookline are exempt from the Prevention of Significant Deterioration of Air Quality (PSD) provisions and regulations of the Clean Air Act, 42 U.S.C. §§ 7470-7479; 40 C.F.R. § 52.21.
 
 
 2
 The respondents are Anne McGill Gorsuch, the Administrator of EPA, and Medical Area Total Energy Plant, Inc. (MATEP), owner of the plant. The President and Fellows of Harvard College (Harvard) appear as intervenor. We have jurisdiction under 42 U.S.C. § 7607(b)(1).
 
 
 3
 The exemption was granted because the ARA found that the owner of the diesel engines was a nonprofit health or education institution within the meaning of 42 U.S.C. § 7479(1) and 45 Fed.Reg. 52676, 52739 (1980) (to be codified in 40 C.F.R. § 52.21(i)(4)(vi) (1981)).
 
 
 4
 The plant in question is a large facility designed to produce electricity, steam, and chilled water. It is to contain six diesel engines-making it, according to the petitioners, the largest diesel power plant in the United States-that will generate heat that will help to make steam in the electric generation portion of the facility. Most of the heat to generate steam will, however, come from other sources. The steam will be used not only to generate electricity but also to provide space heat in certain buildings, hence the plant is a cogeneration facility. Electric chillers will be used to produce chilled water for air conditioning in those buildings. The steam and chilled water portions of the facility are in operation and are not subject to PSD review. The question is whether the diesel engines must undergo PSD review by EPA before installation.
 
 
 5
 The facility is owned and operated by a corporation, MATEP, organized under Chapters 156 (business corporations) and 121A (urban redevelopment corporations) of the Massachusetts General Laws Annotated. All of MATEP's issued and outstanding stock is owned by Harvard. Harvard conceived of and set up MATEP to own the facility in the hope that a taxable financial institution would purchase MATEP's stock in order to reap certain tax benefits and would lease the facility back to a service corporation to which Harvard belonged at a rate reflecting the tax benefits. No institution was interested, however, and Harvard kept the stock and retained the MATEP structure while going ahead with the cogeneration facility.
 
 
 6
 Harvard planned that the cogeneration facility would meet the electricity, steam, and chilled water needs of Harvard's Medical School, Dental School, and School of Public Health and of six so-called "affiliated teaching hospitals."[2] Harvard has entered into contracts with all of these hospitals to supply their total electricity, steam, and chilled water needs. The hospitals will pay for these services at the rates charged by public utilities for comparable services although Harvard had hoped that the efficiencies of cogeneration and third-party ownership of MATEP would mean lower costs. Even at the current rates, Harvard will sustain losses initially. Should operation of the facility later yield financial savings, as a result of relatively lower operating costs, third-party financing of the facility, or sale of the facility to a third party, the hospitals will, under the terms of their utilities contracts, be able to participate in such savings. Any "profits" will be reflected in lower costs to Harvard and the hospitals. In addition, less than two percent of the facility's steam capacity will be sold to the Massachusetts College of Art, a nonprofit state educational institution, and less than five percent of the steam capacity (but no electricity, according to respondents) will be provided at no cost to Mission Park, a subsidized housing project.
 
 
 7
 This case concerns only one of the several federal and state air pollution requirements that MATEP must meet in order to install the diesel engines. The PSD provisions of the federal Clean Air Act require so-called "major emitting facilities," which MATEP with its diesel engines would be, to obtain permission from their states (if the state has a PSD program) or from EPA for their construction. Permission is granted only if the proposed plant satisfies PSD requirements, which, broadly speaking, are that the plant will not cause a significant deterioration in the quality of air in the region. 42 U.S.C. §§ 7470-7479. This permission procedure does not apply, however, to "new or modified facilities which are nonprofit health or education institutions which have been exempted by the (s)tate." Clean Air Act § 169(1), 42 U.S.C. § 7479(1). In states such as Massachusetts that do not have their own PSD review programs and that are therefore regulated directly by EPA, the governor of the state may request EPA to exempt nonprofit health or education institutions from PSD requirements. 45 Fed.Reg. 52676, 52739 (1980) (to be codified in 40 C.F.R. § 52.21(i)(4)(vi) (1981)).
 
 
 8
 Originally contemplating ownership by a third-party financial institution, MATEP, through its owner Harvard, prepared for its PSD review by EPA. When financing was not forthcoming, Harvard decided that MATEP should apply for an exemption under 42 U.S.C. § 7479(1) and the regulation thereunder. Request for an exemption was sent to Governor Edward J. King, who approved it and forwarded it to EPA. The ARA solicited comments on the request, although not required to do so, and decided that MATEP qualified for an exemption. The ARA determined that an exempt facility must meet three requirements: it must have a request from the governor, it must be an "education or health" institution, and it must be nonprofit. The ARA found that Governor King had requested an exemption for MATEP. She also found that, although the facility was not itself a hospital or school, its purpose in serving health or education institutions and its ownership and operation by such an institution qualified it as a health or education institution. Finally, according to the ARA, the fact that MATEP "exists solely for the benefit of and is merely an extension of Harvard and the Affiliated Teaching Hospitals, all of which are nonprofit institutions" and the fact "that neither MATEP nor Harvard is expected to receive a profit in the conventional sense" provided two independent grounds for finding that MATEP is nonprofit.
 
 
 9
 "Under the Clean Air Act, our scope of review in this case is limited to determining whether the ARA's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A).[3] The case law has established the principle that a court should give deference to an administrative agency's decision. Udall v. Tallman, 380 U.S. 1, 16-18 (85 S.Ct. 792, 801-802, 13 L.Ed.2d 616) (1965); Train v. Natural Resources Defense Council, 421 U.S. 60, 87, (95 S.Ct. 1470, 1485-1486, 43 L.Ed.2d 731) (1975)." This principle of deference has had, however, varied applications depending on the nature of the decision reviewed. Thus "(a) lthough an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history.' Teamsters v. Daniel, 439 U.S. 551, 566 n.20 (99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808) (1979)." Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). See also Federal Election Commission v. Democratic Senatorial Campaign Committee, --- U.S. ----, ----, 102 S.Ct. 38, 41, 70 L.Ed.2d --- (1981); FCC v. RCA Communications, Inc., 346 U.S. 86, 91, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953); Russell v. Law Enforcement Assistance Administration, 637 F.2d 1255, 1264 (9th Cir. 1980). Greater deference is given where the agency decision relates to factual matters in which the agency has special technical expertise, FPC v. Florida Power & Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 643-644, 30 L.Ed.2d 600 (1972), as well as to matters of apparently mixed factual and legal issues in which the agency has expertise, American Ship Building Co. v. NLRB, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965). Longstanding agency practice, particularly where acquiesced in by the Congress, also receives deferential treatment. Saxbe v. Bustos, 419 U.S. 65, 74, 95 S.Ct. 272, 278-279, 42 L.Ed.2d 231 (1974). We may rely more heavily on our own judgment when reviewing an administrative decision that does not require highly specialized expertise. Sarah Coventry, Inc. v. T. Sardelli & Sons, Inc., 526 F.2d 20, 22 (1st Cir. 1975), cert. denied, 426 U.S. 920, 96 S.Ct. 2626, 49 L.Ed.2d 374 (1976). This case involves a mixed question of law and fact, the interpretation and application of the phrase "nonprofit health or education institution," which has not been explained elsewhere. Analysis of the question does not require much in the way of technical expertise, specifically not special competence in environmental matters. We will accordingly take a "hard look," Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), at the ARA's decision, but we do accord her views, particularly her factual conclusions, some weight.
 
 
 10
 Before dealing with specific arguments, we ordinarily turn in a case of first impression such as this to the legislative history of the statute. Unfortunately, section 169(1) has virtually no such history. The only references to it are along the lines of the following sentence in a House Report: "States may exempt nonprofit educational and health institutions emitting less than 250 tons (of pollutants) per year." H.R.Rep.No. 294, 95th Cong., 1st Sess. 144-45, reprinted in (1977) U.S. Code Cong. & Ad. News 1077, 1223-1224. See H.R.Rep.No. 564, 95th Cong., 1st Sess., reprinted in 123 Cong.Rec. 26570, 26610, 26611 (1974). These statements provide no explanation beyond the language of the statute.
 
 
 11
 The petitioners take two tacks in arguing that MATEP and its relationship with Harvard and the hospitals do not constitute a nonprofit institution. Brookline focuses on the independent corporate existence of MATEP (not itself a nonprofit institution) and argues that the ARA's finding of a joint arrangement between MATEP, Harvard, and the hospitals amounted to a piercing of MATEP's corporate veil, which is not warranted absent fraud or some other violation of public policy. Mission Hill presents this same argument but also contends that MATEP's organization as a business corporation, not as a nonprofit corporation, the possibility of sales of electricity by MATEP to Boston Edison Company, and MATEP's issuance of stock make MATEP a for-profit institution.
 
 
 12
 The ARA's answer to these arguments was that the "joint arrangement" between MATEP, Harvard, and the hospitals constituted a nonprofit institution. MATEP and Harvard reply in more detail. With respect to Brookline's contention about piercing the corporate veil, they argue that this doctrine is primarily one of state law which should not control a federal statute and that the federal law on piercing the corporate veil makes greater allowances for piercing in light of the policies of relevant federal statutes.
 
 
 13
 The mere existence of a federal statute regulating corporations or other institutions does not render inapplicable the state law governing such entities, e.g., Burks v. Lasker, 441 U.S. 471, 477-80, 99 S.Ct. 1831, 1836-1838, 60 L.Ed.2d 404 (1979). Whether state law aids in the application of federal law depends on the purpose of the federal law. The PSD exemption has no explanatory legislative history, but it would seem to serve two purposes. First, nonprofit institutions are not required to bear the expense of PSD review and the cost of pollution controls that may be required thereafter. In addition, these institutions need not analyze the costs and benefits of installing equipment that ordinarily requires PSD review because such analysis might make them reluctant to use such equipment and, as a result, hinder their other activities. What constitutes a nonprofit institution for these purposes would appear to depend on only the most general features identified with nonprofit institutions. The two principal features of nonprofit institutions are that they do not distribute profits to stockholders or others and, usually, that they are organized for limited purposes, although this second feature is becoming less common. Hansmann, The Role of Nonprofit Enterprise, 89 Yale L.J. 835, 838-40 (1980). In determining whether a facility qualifies as nonprofit for a PSD exemption, then, the EPA Administrator should look primarily at the disposition of the profits, if any, of the facility and, secondly, at its purposes.
 
 
 14
 Petitioners urge two points of state law, that MATEP was organized as an urban redevelopment corporation and as a for-profit corporation, not as a nonprofit one, and that Massachusetts law forbids piercing MATEP's corporate veil to find a "joint arrangement" with Harvard and the hospitals. For purposes of the PSD exemption, however, the meaning of "nonprofit institution" does not turn on whether a corporate entity exists or on how it might be classified. In order to serve the statute's purposes, the phrase "nonprofit institution" requires only that we look at the nature of the institution to determine whether it is nonprofit; the application of particular Massachusetts statutes to the institution will not necessarily affect achievement of these purposes. Thus, if a corporation running a facility is owned entirely by another institution, we may properly consider the nature of the owner institution as a factor in determining the nonprofit status of the facility.
 
 
 15
 Although the state law arguments advanced here that MATEP's corporate veil should not be pierced do not apply, there is also some federal law on piercing the corporate veil. This law has developed in cases involving other regulatory statutes as different as the Clayton Act, see, e.g., Klinger v. Baltimore & Ohio R.R., 432 F.2d 506 (2d Cir. 1970), the Interstate Commerce Act, Schenley Distillers Corp. v. United States, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946) (per curiam), and the Communications Act of 1934, Capital Telephone Co. v. FCC, 498 F.2d 734 (D.C.Cir.1974). The general rule adopted in the federal cases is that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." Id. at 738 (citations omitted). In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, see Schenley Distillers Corp. v. United States, 326 U.S. at 437, 66 S.Ct. at 249; Flink v. Paladini, 279 U.S. 59, 62, 49 S.Ct. 255, 255, 73 L.Ed. 613 (1929), an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine, Capital Telephone Co. v. FCC, 498 F.2d at 738-39. As we observed above, the purposes of the PSD exemption are not affected by the corporate form of the nonprofit health or education institution.[4] The ARA acted in accordance with federal law in looking beyond MATEP to Harvard's ownership and the relationship with the hospitals.
 
 
 16
 In light of the relationship between the PSD exemption and state and federal law, we believe that the ARA did not act arbitrarily and capriciously in concluding that the facility is nonprofit. MATEP is wholly owned by a nonprofit institution, Harvard, and, under the terms of its contracts with the hospitals, the ARA could reasonably conclude that the facility will not make a profit on its sales of electricity, steam heat, and chilled water. The fact that MATEP issues stock, an activity forbidden to nonprofit institutions under Mass.Gen.Laws Ann. ch. 180, § 3, was properly disregarded because the classification of a corporation in Massachusetts is not determinative of an institution's nonprofit status under the Clean Air Act. The ARA also relied on the "joint arrangement" between MATEP, Harvard, and the affiliated teaching hospitals, but to the extent that this factor is different than the nonprofitability of MATEP provided for in the utilities contracts, we have some difficulty with it. If a for-profit institution owned and operated MATEP, a "joint arrangement" between it and the hospitals would not necessarily make the facility a nonprofit institution. In the circumstances here, however, we hold that the ARA acted within her discretion.
 
 
 17
 Mission Hill, in arguing that the facility is not nonprofit, places particular stress on the facts that, under the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C. § 824a-3(a)(2), MATEP may sell power to existing public utilities and that Harvard has had discussions with Boston Edison with this possibility in mind. The ARA decided, however, that the possibility of commercial sales to a public utility did not render a cogeneration facility a for-profit institution under the Clean Air Act. In addition, she found that in this case, under the terms of the utilities contracts between Harvard and the hospitals, additional revenues from such sales would ultimately reduce the cost of the utilities to Harvard and the hospitals. These institutions would not make a profit from such sales. We hold that the ARA reached reasonable conclusions. The bare possibility of commercial sales under PURPA does not change the character of a nonprofit institution for the purposes of the Clean Air Act exemption outlined above, particularly when there is little likelihood that such sales will occur. Moreover, as the ARA pointed out, if in fact such sales occur, they might at that time affect the institution's exempt status. The ARA's conclusion that any sales to Boston Edison would eventually result in reduced utilities costs for the hospitals as well as for Harvard was neither arbitrary nor capricious.
 
 
 18
 A facility must also be a health or education institution in order to attain exempt status under the Clean Air Act, and the petitioners also argue that the cogenerating facility here does not meet this requirement. The ARA found that the facility did satisfy this requirement for several reasons. The facility, according to the ARA, though not itself a school or hospital, served the purpose of providing energy to seven health or education institutions, Harvard and the hospitals. She found, further, that the facility is owned by and operated for the benefit of health or education institutions. She also decided that the facility furthered the purposes of the National Health Planning and Resources Development Act (NHRDA), 42 U.S.C. § 300k-2(a)(5), (11), and of PURPA, to give "priority consideration" to the furnishing of support services to health service institutions and to promote energy conservation and the growth of cogeneration facilities, respectively. Noting that had Harvard and each hospital constructed its own small power plant, those facilities would have been exempt, the ARA stated that the "joint arrangement" between all the institutions was in this case appropriate. The ARA also decided that MATEP's formal corporate independence was unimportant.
 
 
 19
 The petitioners contend, however, that the ruling of the Massachusetts Appeals Court in Town of Brookline v. Medical Area Service Corp., 8 Mass.App. 243, 392 N.E.2d 1070 (1979), that the plant was not a "health care facility" under Mass.Gen.Laws Ann. ch. 111, § 25B should control this issue. Even assuming that this state law determination should be given weight, this holding would not apply here because the court decided that the Massachusetts statute was intended and written to cover only a narrow range of patient care services. "Health or education institution" in the Clean Air Act is much broader. Indeed, the Massachusetts court suggested that the facility would come within the definition of "hospital" used in the NHRDA, 42 U.S.C. § 300s-3(1). 392 N.E.2d at 1077 n.23. Brookline also argues that the facility is not educational because it itself does not serve educational purposes. We disagree and uphold the ARA's finding that Harvard's ownership and the hospitals' purchases of energy further education and health goals. Brookline's reliance on Massachusetts tax cases holding that activities of an institution not directly related to health or education are not health or education activities is misplaced because the state statute speaks more narrowly of "charitable purposes," Mass.Gen.Laws Ann. ch. 59, § 5, than does the Clean Air Act's reference to "health or education institutions." Both state and federal tax statutes require that particular activities of an institution qualify as charitable; the broader language of the PSD exemption suggests Congress did not intend such a confining result. Finally, Mission Hill argues that the facility is actually a public utility because of the possibility of sales of power to Boston Edison. We reject this argument for reasons already stated in concluding that such a possibility did not make MATEP a for-profit corporation.
 
 
 20
 We find that the ARA acted in accordance with law in deciding that the facility is a "health or education institution." The purpose of this requirement appears to be that a health or education institution need not undergo PSD review nor meet antipollution requirements imposed thereafter in order to go ahead with the construction and use of its own cogenerating facility. The phrase "health or education institution" is broad enough to include a facility owned and operated by the shell corporation of a health or education institution where such ownership would not interfere with the purposes of the exemption. Indeed, to hold otherwise, as petitioners suggest we do in pointing to the ARA's finding that the facility is not, in isolation, a health or education institution, would destroy the exemption. A health or education institution must own a facility in some manner, and the corporation used by Harvard is appropriate. Petitioners show no advantages Harvard obtains through use of the corporation that warrant (or even merely offset the disadvantages of) denial of the exemption for which institutions owning facilities directly qualify. In addition, although we consider ownership by Harvard the more important factor, the diesel engines at issue here will supply electricity and steam heat virtually only to health or education institutions, Harvard, the hospitals, and the Massachusetts College of Art.[5] Finally, the ARA's consideration of the policies underlying the NHRDA and PURPA was not arbitrary and capricious, although this factor alone would not necessarily bring a facility within the "health or education institution" exemption.
 
 
 21
 Petitioners' final attack on the ARA's decision is that it is based on a faulty request from Governor King. Brookline argues that Governor King failed to make any determination that the facility qualified for an exemption, as Congress contemplated in the Clean Air Act. This apparent failure proved troublesome, Brookline contends, because, after Governor King transmitted the request to EPA, he was informed that MATEP, not another corporation, would operate the facility and because Harvard is now considering sales of electricity to Boston Edison. Mission Hill emphasizes the possible sales, too, and asserts that Governor King mistakenly based his request on the fact that only Harvard and the hospitals would receive electricity from the diesels because electricity may also be sold to Boston Edison. Petitioners want the case remanded to Governor King so that he can consider the request again more thoroughly.
 
 
 22
 We reject these arguments. The ARA determined that the statute and regulations required only a request from the governor and did not require an investigation into the nature of the request. We believe that this construction of the law is reasonable for two reasons. First, the ARA makes her own determination whether the facility is a "nonprofit health or education institution," so any mistakes by the governor will be corrected. The statute and regulation give the governor an opportunity to deny an exemption by refusing a request, but they also authorize the Regional Administrator to avoid misinterpretations of the law. Compliance with the law can be ensured without review of the process of requests to the governor. Conceivably, a request itself might be vulnerable if wholesale misrepresentations are made to the governor, but that is not the case here. Second, considerations of federalism suggest that we not examine the actions of the governor where implementation of the federal statute does not so require. The manner in which a request is made to the governor is not critical to the question whether an exemption should be given, and we do not review it here.
 
 
 23
 The EPA's final determination is affirmed and the petition is denied.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 The Brookline and Mission Hill parties have filed briefs, but they also argue on behalf of a group of residents of Brookline called "Brookline Citizens to Protect the Environment," Congressman Barney Frank, State Senator Jack H. Backman, and State Representative John A. Businger
 
 
 [2]
 The hospitals are Brigham and Women's Hospital, the Beth Israel Hospital Association, the Children's Hospital Medical Center, Joslin Diabetes Foundation, Inc., New England Deaconess Hospital, and Sidney Farber Cancer Institute, Inc
 
 
 [3]
 We reject Mission Hill's contention that we should review the ARA's decision on a de novo basis
 
 
 [4]
 Petitioners cite to us several federal tax cases for the proposition that the corporate form is not to be disregarded. It is almost black-letter law that for purposes of the Internal Revenue Code, distinctions between a corporation and its stockholders will be observed. E.g., Dalton v. Bowers, 287 U.S. 404, 410, 53 S.Ct. 205, 206, 77 L.Ed. 389 (1932). This is so because the Code provides both benefits and burdens based explicitly on the existence of at least formally independent corporations, something the Clean Air Act does not do
 
 
 [5]
 Respondents advise us that electricity generated by the diesel engines will not be furnished to Mission Park, but steam heat, generated in part by the diesels, will be. The ARA acted properly in regarding this supply as de minimus